STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

PROVIDENCE COUNTY                                           SUPERIOR COURT

JASON BOUDREAU, Plaintiff                 )
                                          )
v.                                        )          Case No. PC-17-2347
                                          )
KEVIN PETIT, STEVE LUSSIER,               )
JOHN LUSSIER, DONALD LUSSIER,             )
JAMES BROWN, NICHOLAS RIVELLO,            )
CITY OF WARWICK, WARWICK POLICE           )
DEPARTMENT, RHODE ISLAND STATE            )
POLICE, Defendants                        )

## PLAINTIFF'S ORIGINAL COMPLAINT

Now comes the Plaintiff, Jason Boudreau, and hereby files his Complaint against Kevin Petit, Steve Lussier, John Lussier, Donald Lussier, James Brown, Nicholas Rivello, the City of Warwick, the Warwick Police Department, and the Rhode Island State Police.

### VENUE

1. This action is brought in Rhode Island Superior Court, County of Providence, pursuant to Rhode Island General Laws §9-4-3.

### PARTIES

2. Plaintiff Jason Boudreau is and was at all relevant times mentioned herein, a citizen of the United States and a resident of the State of Rhode Island.

3. Defendant Kevin Petit is and was at all relevant times mentioned herein, a citizen of the United States and a member of the Warwick Police Department. He is sued in his individual capacity.

4. Defendant Steve Lussier is and was at all relevant times mentioned herein, a citizen of the United States and a resident of the State of Rhode Island.

5. Defendant John Lussier is and was at all relevant times mentioned herein, a citizen of the United States and a resident of the State of Rhode Island.

6. Defendant Donald Lussier is and was at all relevant times mentioned herein, a citizen of the United States and a resident of the State of Rhode Island.

7. Defendant James Brown is and was at all relevant times mentioned herein, a citizen of the United states and a member of the Rhode Island State Police. He is sued in his individual capacity.

8. Defendant Nicholas Rivello is and was at all relevant times mentioned herein, a citizen of the United States and a member of the Rhode Island State Police. He is sued in his individual capacity.

SUPERIOR COURT
FILED
HENRY S. KINCH, JR.

17 MAY 18 PH 2:49

1

9.   Defendant City of Warwick is a municipality in the State of Rhode Island.

10.  Defendant Warwick Police Department is a municipal law enforcement entity in the State of Rhode Island.

11.  Defendant Rhode Island State Police is a municipal law enforcement entity in the State of Rhode Island.

## FACTS

12.  That In September, 2009 the Plaintiff was hired by Automatic Temperature Controls, Inc as the Finance Manager. The Plaintiff's base salary was $55,000 per year. The Plaintiff also was eligible for a bonus equal to 10 percent (10%) of the annual operating cost savings (year over year) (Exhibit 1 - ATC Inc Finance Manager Memo)

13.  The Plaintiff reported directly to Steve Lussier. Steve Lussier was the President of Automatic Temperature Controls, Inc (ATC Inc) and was also a shareholder.

14.  Defendant John Lussier was the Vice President of ATC, Inc and was also a shareholder.

15.  Defendant Donald Lussier was a shareholder of ATC, Inc.

16.  The "Basic Functions" of the position of Finance Manager included but were not limited to (1) managing the finance department, (2) monthly financial statements, (3) cash flow analysis, (4) managing accounts payable, (5) managing accounts receivable, (6) managing weekly payroll, (6) managing all insurance programs, (6) providing the metrics & systems to measure the company's performance. (Ex 1 - ATC Inc Finance Manager Position at page 2)

17.  As the Fianance Manager, the Plaintiff had the authority to hire & fire direct reports, choose the company's accountant and insurance carriers, and had a $20,000 purchasing authority (Exhibit 1- ATC Inc. Finance Mgr Position at pge 2).

18.  As the Finance Manager, the Plaintiff was responsible for developing and maintaining all financial systems, accounting software, and records. (Exhibit 1 - ATC Inc Finance Mgr Position at page 2).

19.  As the Finance Manager, the Plaintiff was responsible for the weekly payroll (federal and internal) (Exhibit 1 - ATC Inc Finance Mgr Position at page 2)

20.  At the end of 2009, after a meeting with Steve Lussier to discuss the issues facing the company and potential resolutions for those issues, the Plaintiff received a salary increase to $65,000 per year.

21.  In early 2010, after additional meetings with Steve Lussier regarding numerous operational issues that were adversely affecting the financial health of Automatic Temperature Controls, Inc, the Plaintiff became the Finance & Operations Manager.

22.  The additional responsibilities that the Plaintiff assumed included, but was not limited to (1) fixed asset management, (2) KMC inventory management, (3) Workers Compensation & Claims management, (4) Service Dept management, (4) Project Management Coordination, (5) Purchase management, (6) Vehicle GPS system management, (7) Employee Benefit management, (8) Vehicle maintenance management, (9)Operational performance metrics. An email from the Plaintiff to Steve Lussier on November 24, 2010 discusses these responsibilities in greater detail.

23.  That the operational metrics included (1)cell phone usage analysis, (2) vehicle fuel cost and repair cost analysis, (3) Vehicle miles by employee, (4) Unbillable hours/shop time, (5) Navy contract monthly hours, (6) Hours by job, (7) Revenue per production hour, (8) Avg Service calls, (9) Monthly work orders, (10) Operating cost breakdown.

24.  That the Plaintiff provided operational metrics and reports via email to Steve Lussier, John Lussier, and Donald Lussier on monthly basis, including emails sent on November 19, 2010 and January 12, 2011.

25.  The Plaintiff also provided financial metrics on a monthly basis that included but was not limited to (1) Balance Sheet Ratio analysis, (2) asset ratio analysis, debt ratio analysis, (3) Liquidity ratios, (4) profitability ratios, (5) Accounts Payable & Accounts Receivable summary, (5) budget variances, (6) monthly sales trend, (7) monthly profit trend, (8) Cost of labor analysis, (9) cost of material analysis, (10) cash analysis, (11) overhead analysis.

26.  That the Plaintiff provided financial metric reports via email to Steve Lussier, John Lussier, Donald Lussier on a monthly basis, including emails sent on November 19, 2010 and January 12, 2011.

27.  That the Plaintiff was responsible for providing monthly financial statements and reports to Steve Lussier, John Lussier, and Donald Lussier.

28.  That those financial statement reports included, but were not limited to, (1) Balance Sheet, (2) Profit & Loss statement, (3) Comparative Balance sheet, (4) Comparative Profit & Loss statement, (5) Budgetary Income statement, (6) Monthly trial balance, (7) Fiscal Year Profit & Loss by month, (8) Job cost & billing summary, (9) Work in progress statement, (10) Job gross profit report, (11) Accounts payable ageing, (12) Accounts receivable ageing (13)Accounts payable monthly journal, (14) Cash payment transaction report, (15) Checking account ledger report, (16) Detailed monthly ledger report, (17) Payroll transaction report. These financial reports were emailed monthly to Steve Lussier, John Lussier, and Donald Lussier, including on November 18, 2010. Additionally, these reports were kept in printed form in monthly 3-ring binders on a shelf in the Plaintiff's office at ATC, Inc.

29.  That the Plaintiff was responsible for processing the weekly office and management payroll, which included weekly salary and bonuses to office and management staff.

30.  That the Plaintiff did email the weekly payroll to American Payroll in Johnston, RI each week for processing.

31. That American Payroll would provide detailed weekly reports to the Plaintiff and that those reports were kept in specific payroll binders inside of the Plaintiff's office.

32. That ATC Inc shareholders, including Steve Lussier, Donald Lussier, and John Lussier could review the financial statement report binders at any time.

33. That ATC Inc shareholders, including Steve Lussier, Donald Lussier, and John Lussier could review the payroll statement/report binders at any time.

34. That Steve Lussier, as President of ATC Inc, had full access to the Accounting Software at ATC Inc and that software was called American Contractor.

35. That Steve Lussier could access all accounting and financial information in the American Contractor accounting software inclunding checking account transactions and payroll transactions.

36. That begining in 2010, the Plaintiff provided "Daily Business Snapshot" reports to Steve Lussier, John Lussier, and Donald Lussier. These daily reports included daily cash flow summary, operating income including customer receipts, operating expenses included accounts payable payments and payroll expenses, as well as daily updates on the monthly profit and loss of the company. These reports were emailed daily including, but not limited to December 9, 2010.

37. That the Plaintiff provided a "12-week cash flow forecast" weekly to Steve Lussier, John Lussier, and Donald Lussier. This report forecast cash payments and receipts, including projected payroll expenses. The Plaintiff emailed this report weekly including on March 25, 2010 and April 20, 2010.

38. That the Project & Service meeting minutes from May 7, 2010 list the Plaintiff as the Fiinance & Operations Manager and John Lussier as Project Manager. These minutes were emailed on May 7, 2010 to Steve Lussier, John Lussier, and Donald Lussier.

39. That in 2010 ATC Inc needed a new Accounts Receivable accountant and that John Lussier wanted the company to hire his girlfriend. The Plaintiff hired Christine Bisson instead.

40. That in 2010 the Plaintiff hired a project manager, Jason Misasizek to assume most of the work that John Lussier was doing, in an effort to make the company more profitable as John Lussier was personally responsible for several job sites being mismanaged, leading to financial losses for the company.

41. That throughout 2009 to 2011, the Plaintiff and Steve Lussier had extensive and voluminous email and oral discussions regarding John Lussier's effect on the company's financial health.

42. That the Plaintiff openly discussed John Lussier's animosity toward the Plaintiff with Steve Lussier both in email and oral communications in

2010 and 2011.

43. That bases on the year over year cost savings for the 2009-2010 fiscal year, the Plaintiff received a bonus in excess of $50,000. (fifty thousand dollars).

44. To ensure that the company cash flow would not be adversely affected, the Plainitff was paid that bonus over time from May 12, 2010 to September 15, 2010.

45. That the company fiscal year ran from July 1 to June 30 annually.

46. That other managers and officers received a bonus for fiscal year 2009 - 2010 including Robert Martel, Michael White, Steve Lussier and John Lussier.

47. That in 2010 the Plaintiff and Steve Lussier discussed a bonus compensation plan for the other accountants at ATC Inc. Deborah Donahue, the Accounts Payable accountant, would be eligible for a monthly bonus that was equal to twenty-five percent (25%) of the accounts payable discounts taken in each month.

48. That Deborah Donahue's job duties included, but was not limited to, processing and payment of accoutns payable invoices, weekly certified payrolls, and processing weekly payroll for field employees (non-officer/ non-management).

49. That Linda Robertus, the accounts receivable accountant, was eligible for a monthly bonus that was based on the outstanding accounts receivable invoices. Those bonus metrics included keeping total accounts receivable balances under 15% for billing over 90 days; under 6% for billing 60 to 89 days old; and under 6% for billing 30 to 59 days old.

50. That after Linda Robertus' departure from the company in June 2010, that Christine Bisson was hired to replace Mrs. Robertus and was also eligible for the same bonus compensation.

51. That in 2010 the Plaintiff and Steve Lussier developed a bonus compensation plan for the ATC Inc service department employees based on the gross profit of the service department invoices.

52. That the service department bonus compensation plan included a five percent (5%) bonus that was distributed among the ATC Inc service technicians.

53. That the service department bonus compensation plan included a one percent (1%) additional bonus that was paid to the lead service technician, Mark Harrison.

54. That the service department bonus was computed both monthly and quarerly, and was paid to employees quarterly, as cash flow allowed.

55. That Robert Martel, a manager for ATC Inc's Franklin Massachusetts division was entitled to a annual bonus equal to five percent (5%) of the Franklin division's net profit.

56. That Michael White, a manger for ATC Inc's Franklin Massachusetts division, was entitled to an annual bonus equal to five percent (5%) of the Franklin division's net profit.

57. That in 2010, the Plaintiff and Steve Lussier developed a bonus incentive plan for all field employees. The bonus comprised of a two-percent bonus pool based on two-percent (2%) of the gross profit of each project that met its twenty-percent (20%) profit goal. The bonus would be distributed to the field employees based on the number of hours each had worked on the project. These bonuses were calculated monthly and quarterly, and were disbursed throughout the year as cash flow allowed.

58. That in 2010, the Plaintiff and Steve Lussier developed a bonus incentive plan for the salesmen, operations, and project managers. The bonus comprised of two-percent (2%) of the gross profit of each project that met its twenty-percent (20%) profit goal. The salesman for each project would would receive two-percent (2%); the project manager would receive two-percent (2%); and the operations manager would receive two-percent (2%).

59. That Steve Lussier and the Plaintiff developed these bonus plans as a means of distributing bonuses to employees throughout the year.

60. That Steve Lussier and the Plaintiff developed the salesman bonus incentive to reward those employees that successfully bid and won projects that were profitable to the company.

61. That Steve Lussier and the Plaintiff developed the project manager bonus incentive to reward those project managers that successfully ensured that project labor and materials were effectively managed, contributing to the project meeting its expected profitability metric.

62. That Steve Lussier and the Plaintiff developed the operations bonus incentive to reward the operations manager for successfully assisting in monitoring and tracking the financial and operational needs of each project to ensure that each project met its profitability metrics.

63. That with these bonus compensation plans, all employees of ATC Inc were eligible for bonuses throughout the year.

64. That the Plaintiff's operations bonus was developed in recognition that that year-over-year annual bonus would be minimal for 2011 forward as the company realized most of its cost savings in the 2009-2010 fiscal year. Those savings would be maintained in future years, resulting in little to no bonus for subsequent years under the original plan.

65. That all employees were eligible for the salesman bonus incentive if they were the employee that bid successfully on the project.

66. That the project manager bonus was eligible for Steve Lussier, Donald Lussier, John Lussier, Jason Misasizek, Robert Martel, and Michael White.

67. That the gross profit for ATC Inc for the 2009 - 2010 fiscal year was six percent (6%). Gross revenues were $8,276,227 and labor and material costs were $7,804,637 resulting in a gross profit of $471,590.

68. That the gross profit for ATC Inc for the 2010 - 2011 fiscal year was fourteen percent (14%). Gross revenues were $7,029,266 and labor and material costs were $6,042,429 resulting in a gross profit of $986,837.

69. That the annual revenue for ATC Inc decreased from fiscal year 2010 to fiscal year 2011 by fifteen percent (15%).

70. That depsite this reduction in revenue, the gross profit for ATC Inc increased from fiscal year 2010 to fiscal year 2011 by one-hundred and nine percent (109%).

71. That the income from operations for ATC Inc for fiscal year 2010 was a loss of $319,384.

72. That the income from operations for ATC Inc for fiscal year 2011 was a profit of $87,736.

73. That despite the reduction in revenue, the income from operations for ATC Inc for fiscal year 2011 increased by one-hundred and twenty-seven percent (127%) over fiscal year 2010.

74. That ATC Inc's increase in profitability was contributed by an increase in operational management, an increase in project management effectiveness, and an increase in financial management effectiveness.

75. That despite the reduction in revenue, the net income for ATC Inc for fiscal year 2011 increased by one-hundred and one percent (101%) over fiscal year 2010.

76. That the liabilities for ATC Inc decreased from $1,374,765 for fiscal year 2010 to $1,183,051 for fiscal year 2011. A decrease of $191,714. This represents a decrease of liabilities of fourteen percent (14%).

77. That in 2010, the salary for Jason Misiaszek was $961.00 per week.

78. That in 2010, the salary for Christine Bisson was $807.69 per week.

79. That in 2010, the salary for John Lussier was $1,400.00 per week

80. That in 2010, the salary for the Plaintiff was $1,400 per week

81. That in 2010, the salary for Steve Lussier was $1,600 per week.

82. That in 2010, the salary for Michael White was $1,400 per week.

83. That on December 15, 2010 ATC Inc paid a Christmas bonus to all office and management employees that was equal to one-week's salary. Christmas bonus receipients included Steve Lussier, Deborah Donahue, Christine Bisson, Michael White, Robert Martel, John Lussier, Jason Misasizek, and the Plaintiff.

84. That for the 1st Quarter of 2010, the ATC Inc service department generated a profit of $137,775.00. Based on the bonus compensation plan, Mark Harrison, the lead service technician would receive one-percent (1%) bonus of $1,377.75 and the service techs would share five-percent (5%) in the amount of $6,888.75. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $2,755.50.

85. That for the 2nd Quarter of 2010, the ATC Inc service department generated a profit of $128,402.57. Based on the bonus compensation plan, Mark Harrison, the lead service technician would receive one-percent (1%) bonus of $1,284.03 and the service techs would share five-percent (5%) in the amount of $6,420.13. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $2,568.05.

86. That for the 3rd Quarter of 2010, the ATC Inc service department generated a profit of $205,236.00. Based on the bonus compensation plan, Mark Harrison, the lead service technician would receive one-percent (1%) bonus of $2,052.36 and the service techs would share five-percent (5%) in the amount of $10,261.80. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $4,107.80

87. That for the 4th Quarter of 2010, the ATC Inc service department generated a profit of $172,872.00. Based on the bonus compensation plan, Mark Harrison, the lead service technician would receive one-percent (1%) bonus of $1,728.72 and the service techs would share five-percent (5%) in the amount of $8,643,60. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $3,457.44

88. That for the 1st Quarter of 2011, the ATC Inc service department generated a profit of $187,394.00. Based on the bonus compensation plan, Mark Harrison, the lead service technician would receive one-percent (1%) bonus of $1,873.94 and the service techs would share five-percent (5%) in the amount of $9,369.70. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $3,747.87

89. That for the 3rd Quarter of 2010, the ATC Inc installation department generated a profit of $357,357.16. Based on the bonus compensation plan, the total bonus payout would equal $28,588.57. The field/installation employees would share two-percent (2%) of $7,147.14. The project managers for each project would receive two-percent (2%) of $7,147.14. The sales staff for each project would receive two-percent (2%) in the amount of $7,147.14. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $7,147.14.

90. That for the 1st Quarter of 2011, the ATC Inc installation department generated a profit of $330,557.00. Based on the bonus compensation plan, the total bonus payout would equal $26,444.56. The field/installation employees would share two-percent (2%) in the amount of $6,611.14. The project managers for each project would receive two-percent (2%) in the amount of $6,611.14. The sales staff for each project would receive two-percent (2%) in the amount of $6,611.14. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $6,611.14

91. That for the 2nd Quarter 2010, the ATC Inc Navy service department generated a profit of $73,186.00. Based on the bonus compensation plan, the total bonus payout would equal $5,854.88. The service technicians would share six-percent (6%) in the amount of $4,391.19. The Plaintiff as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $1,463.73.

92. That for the 3rd Quarter of 2010, the ATC Inc Navy service department generated a profit of $102,327. Based on the bonus compensation plan, the total bonus payout would equal $8,186.16. The service technicians would share six-percent (6%) in the amount of $6,139.64. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $2,046.55.

93. That for the 4th Quarter of 2010, the ATC Inc Navy service department generated a profit of $88,788.00. Based on the bonus compensation plan, the total bonus payout would equal $7,103.04. The service technicians would share six-percent (6%) in the amount of $5,327.31. The Plaintiff, as the Finance & Operations Manager, would be eligible for two-percent (2%) in the amount of $1,775.77.

94. That John Lussier received bonuses, including but not limited to, $1,174.70 on December 8, 2010; $1,031.35 on March 23, 2011; $1,052.27 on March 30, 2011; and $3,500 on June 8, 2011. Bonus payments to Defendant John Lussier exceeded $20,000 for the first half of 2011.

95. That Jason Misasizek, one of ATC, Inc's project managers, received bonuses, including but not limited to, $3,000 on January 5, 2011. Jason Misasizek received bonuses in the first half of 2011 in excess of $8,000.00

96. Defendant Steve Lussier received bonuses, including but not limited to, $2,128.69 on December 8, 2010; $10,000 on May 11, 2011. Bonus payments to Defendant Steve Lussier exceeded $24,000 for the first half of 2011.

97. That on April 26, 2011 Defendant Steve Lussier sent an email to the Plaintiff that stated, "Jay, your job performance is not the issue with Mike. If he saw the day to day improvement of the operations then we probably wouldn't have the issues  we have been having between you and him....I will not let it revert to the old way, currently they are on notice that if it doesn't turn around the branch is finished and will be absorbed into Cranston. Plain and simple."

98. That on December 30, 2010 Defendant Steve Lussier sent an email to the Plaintiff that stated, "Can I use your emails to develop a management training strategy with Zito. Our one on one meetings really aren't too productive, he can take on Johns lack of management training. Donald has already given the thumbs up to him getting training or some kind of management schooling."

99. That the Plaintiff processed payroll bonus checks, as needed, for all office and management staff including Steve Lussier, John Lussier, Jason Misasizek, Michael White, Christine Bisson, Deborah Donahue, and the Plaintiff.

100. That it was the Plaintiff's responsibility to calculate the profit/loss on each prject or service work order as well as to calculate any incentive bonus that applied to each project or work order.

101. That Defendants Steve Lussier, John Lussier, and Donald Lussier had access to the payroll reports that were kept in the Plaintiff's office.

102. That Steve Lussier had access to payroll information in the American Contractor accounting system.

103. That Deborah Donahue had access to the payroll information in the American Contractor accounting system.

104. That the total revenue for fiscal year 2010 for ATC Inc totaled $8,276,277.

105. That the totla revenue for fiscal year 2011 for ATC Inc totaled $7,029,266.

106. That revenue for fiscal year 2011 was down fifteen-percent (15%) from 2010, and the difference in revenue totaled $1,246,961.

107. That total operating expenses for fiscal year 2010 for ATC Inc totaled $8,595,611.

108. That total operating expenses for fiscal year 2011 for ATC Inc totaled $6,941,530.

109. That adjusted for revenue, ATC Inc achieved a four-percent (4%) reduction in costs from fiscal year 2010 to fiscal year 2011.

110. That the four-percent (4%) reduction in costs totaled $343,824.

111. That based on the original bonus plan from 2009, the Plaintiff would be eligible for a ten-percent (10%) bonus of those savings, which equaled a bonus of $34,382.

112. That the reason why all employees in fiscal year 2010-2011 received their bonuses monthly and/or quarterly was to properly account for those bonuses in the periods (months) that they were earned, rather than putting all of the bonuses on the books in one month (June of each year).

113. That in June 2011 Defendant Steve Lussier instructed ATC Inc employee Steve Sorel to install software on the Plaintiff's office computer at ATC Inc that would record screenshots of the Plaintiff's computer activity

114. That the software program was called System Surveillance Pro

115. That ATC Inc employee Steve Sorel surreptitiously installed the System Surveillance Pro software on the Plaintiff's office computer in June 2011.

116. That the System Surveillance Pro software recorded screenshots of the Plaintiff's computer activity.

10

117. That the recorded screenshots included the contents of the Plaintiff's electronic communications, including his web-based, password-protected emails and online bank accounts.

118. That neither Steve Sorel nor Defendant Steve Lussier informed the Plaintiff that the System Surveillance Pro software had been installed on the Plaintiff's office computer.

119. That the System Surveillance Pro software was configured to send the recorded screenshots to a specific email address that could be accessed by Steve Sorel or Defendant Steve Lussier.

120. That the System Surveillance Pro software had a keylogger function.

121. That the keylogger function recorded all keystrokes that the Plaintiff typed on his office computer.

122. That the System Surveillance Pro software was configured to capture additional screenshots based on user-defined keywords that Steve Sorel selected.

123. That one of the keywords selected by Steve Sorel was "Yahoo" in order to ensure that the System Surveillance Pro software would record the Plaintiff's web based, password-protected Yahoo emails.

124. That in June 2011, Defendants John Lussier, Steve Lussier. and Donald Lussier conspired with Defendant Kevin Petit to violate the Plaintiff's civil rights, including warrantless searches of the Plaintiff's office, office computer, password protected online accounts, and vehicles.

125. That on June 24, 2011 Defendant John Lussier, Steve Lussier, Donald Lussier conspired with Defendant Kevin Petit to have the Plaintiff arrested for driving on a suspended license.

126. That the Plaintiff, following the arrest for the suspended license, was let go from the company, ATC Inc.

127. That the Kent County District Court dismissed the Plaintiff's Operating on a suspended license charge.

128. That upon the Plaintiff's seperation from the company, the company refused to pay the Plaintiff his last paycheck and vacation pay in violation of the General Laws of Rhode Island.

129. That in June 2011 the Plaintiff filed a formal complaint with the Rhode Island Department of Labor & Training Labor Standards Board regarding the non-payment of the Plaintiff's wages from ATC Inc.

130. That in June 2011, the Rhode Island Labor Standards Board initiated an investigation of the Plaintiff's complaint.

131. That Defendant Steve Lussier responded in July 2011 to the Plaintiff's complaint by sending a letter to Helen Gage, Chief Examiner of the Rhode Island Labor Standards Board. (Exhibit 2).

11

132. That on July 20, 2011, Helen Gage, Chief Examiner for the Labor Standards Board, ruled in favor of the Plaintiff and ordered that the Plaintiff be paid his unpaid wages. (Exhibit 3).

133. That ATC Inc did not appeal the Rhode Island Labor Standards Board decision.

134. That upon separation from the company, Defendant Steve Lussier refused to return to the Plaintiff any of the Plaintiff's personal property that was in the Plaintiff's office at ATC Inc.

135. That upon separation from the company, the Plaintiff applied for and received unemployment benefits.

136. That in August, 2011 ATC Inc filed a dispute with the Rhode Island Department of Labor & Training disputing the Plaintiff's unemployment benefit eligibility.

137. That upon receipt of the dispute, the Rhode Island Department of Labor & Training suspended the Plaintiff's unemployment benefits.

138. That the Rhode Island Department of Labor & Training held a hearing on January 24, 2012 to determine the Plaintiff's unemployment benefit eligibility.

139. In attendance at the hearing was the Plaintiff, Defendant Steve Lussier, ATC Inc employee Robert Gillheeney, and the Plaintiff's attorney, Matthew Brier.

140. That the hearing was presided over by Gunter A. Vukic.

141. That during that hearing, in sworn testimony, Defendant Steve Lussier stated, "The, um, police actually arrested him at Automatic Temperature Controls, 95 Connecticut Street for a charge of actually not having a, um, valid license, suspended license. Um, during that time, the detective advised me to get Mr. Boudreau out of the office so he could search his computer or take his computer" (Exhibit 3 - Unemployment Transcript at pages 11-12).

142. That during that hearing, hearing officer Gunter Vukic asked Defendant Steve Lussier, "Were you aware that the police were coming in?" Defendant Steve Lussier responded, "Yes, we were aware of the police that were coming in, um, from the day, two days before on the twenty-second. We had actually gone to the Warwick, um, Police Department with what we had found on the computer, um, three days before." (Exhibit 3 - Unemployment transcript, page 13).

143. That during the hearing, Defendant Steve Lussier states that he read the Plaintiff's emails that were recorded with the tracking software. (System Surveillance Pro).

144. That during that hearing, Defendant Steve Lussier states that he took the recorded emails of the Plaintiff to the Warwick Police Department. (Exhibit 3 - Unemployment Transcript page 21)

145. That none of the emails that Defendant Steve Lussier brought to the Police were sent to or sent by Defendant Steve Lussier.

146. That during that hearing, hearing officer Gunter Vukic asked Defendant Steve Lussier, "So did Mr. Boudreau have any questions to your recollection when you told him he's fired?" Defendant Steve Lussier responded, "No, his only question would be that if he receive, if he would receive his last paycheck and his vacation time, which I responded yes, I do remember that".

147. That Defendant Steve Lussier's testimony <u>contradicts</u> his letter to Helen gage of the Rhode Island Labor Standards Board in which Defendant Steve Lussier stated, in writing, "In our company handbook we have printed that upon seperation from our company all property in the employee's possession must be returned to the company. We also under the 'Pay at Time of Seperation from Employment' will account for any outstanding debt owed to the company or any items not returned to the company. A final pay check for the time worked (less deductions) will be issued to the employee. Our accounting is not complete, but since the actions of Mr. Boudreau caused all of the items listed above to be confiscated by the State Police we feel that he is at the very least liable for these items...We feel that we are correct in not paying this dishonest and desperate employee"

148. That Defendant Steve Lussier's letter to Helen Gage was dated July 11, 2011, which was five (5) months before his sworn testimony before officer Gunter Vukic on January 24, 2012.

149. That this contradiction is perjury by Defendant Steve Lussier.

150. That during the hearing, Attorney Brier asked Defendant Steve Lussier, "Now prior to this he had no verbal or written warnings?" Defendant Steve Lussier responded, "No he did not". (Exhibit 3 - Unemployment Transcript at page 28)

151. That during the hearing, Attorney Brier asked Defendant Steve Lussier, "Was that a factor in your decision to let him go?" Defendant Steve Lussier responded, "No the child pornography was the only" (Exhibit 3 - Unemployment transcript at pg. 29)

152. That during the hearing, Attorney Brier asked Defendant Steve Lussier, "Is it fair to say that the primary reason you fired him was because of this allegation of pornography?" Defendant Steve Lussier responded, "Yes". (Exhibit 3 - Unemployment Transcript at pg. 38)

153. That during the hearing, Attorney Brier asked the Plaintiff, "Full time fourteen hundred dollars a week?" That Plaintiff responded "yes" (Exhibit 3 at pg 39)

154. That Defendant Steve Lussier did not dispute the Plaintiff's rate of pay at all during the hearing.

155. That Defendant Steve Lussier did not make any allegations of embezzlement by the Plaintiff at all during the hearing.

156. That officer Gunter Vukic ruled in favor of the Plaintiff, and the Plaintiff received unemployment benefits.

157. That on February 13, 2012, Defendant Steve Lussier and Automatic Temperature Controls, Inc. filed an appeal of officer Gunter Vukic's decision. The appeal did not include any allegations of embezzlement against the Plaintiff.

158. That in March, 2012 the appeal by Defendant Steve Lussier and Automatic Temperature Controls, Inc was denied. As such, the Plaintiff resumed receiving unemployment benefits.

159. That during the Plaintiff's employment at ATC Inc, from 2009 to June 24, 2011, he had an email address of jboudreau@autotempcontrols.com that was provided by ATC Inc.

160. That ATC Inc's email service provider during this time period was Blue Host, which was located in Utah.

161. That in April 2013 ATC Inc decided to switch from an external provider to an internal provider for its email services. (Boudreau v. Lussier, Case No. 13-388S, Docket 95 at pg 2)

162. That in April 2013 ATC Inc purchased a new server and related equipment from Star Computers. Stars Computers installed the new server at ATC Inc. (Boudreau v. Lussier, 13-388S, Docket 94 at pg 2)

163. That in May 2013 the new server was operating at ATC and there was a transition period where emails were being stored at Blue Host and on the new server. There was a process established for deleting emails from the Blue Host server and moving them onto the new ATC internal server. This transition was completed on June 18, 2013. From that date forward, all emails were only being processed by the ATC server. (Boudreau v. Lussier, Case No. 13-388S, Docket 94, pg 2)

164. That deleted accounts were not transferred to the ATC Inc internal email server. Only active employee email accounts were transferred from Blue Host to the new ATC Inc server. (Boudreau v. Lussier, Case No. 13-388S, Docket 94 at pg 2).

165. That the Plaintiff's ATC Inc email, 'jboudreau@autotempcontrols.com' was not transferred to the new ATC Inc internal server in May or June of 2013.

166. That Defendants Steve Lussier, John Lussier, and Donald Lussier deleted the Plaintiff's ATC Inc email account in 2013 intentionally.

167. That Defendants Steve Lussier, John Lussier, and Donald Lussier did not transfer the Plaintiff's ATC Inc email account to the new ATC Inc internal email server in June 2013.

168. That the Plaintiff's ATC Inc email account contained emails to Defendants Steve Lussier and John Lussier, as well as other employees of ATC Inc that pertained to the bonuses paid to employees from January 1, 2010 to June 24, 2011.

169. That Defendants Steve Lussier, John Lussier, and Donald Lussier did intentionally delete the Plaintiff's emails that pertained to bonus payments.

170. That the Plaintiff, while employed at ATC Inc, kept his computer files on the ATC Inc company server. Some of these files were also kept on the Plaintiff's office computer in his office at ATC Inc.

171. That Defendants Steve Lussier, John Lussier, and Donald Lussier did intentionally delete the files that the Plaintiff kept on the ATC Inc server.

172. That on May 28, 2013 the Plaintiff filed a federal lawsuit against Defendants Steve Lussier, John Lussier, and Kevin Petit for violations of the Federal Wiretap Act. The lawsuit was filed in U.S. District Court for the District of Rhode Island. The case number is 13-388-S.

173. That in July 2013 the Plaintiff sent Defendants Steve Lussier, John Lussier, and Kevin Petit a copy of the Complaint, Notice of Lawsuit and Request to Waive Service of a Summons form, and a Waiver of the Service of Summons form. (Exhibit 4 - Waiver of Service form).

174. That in a sworn affidavit, Defendant Steve Lussier stated, "The first notice I ever received that I was being named in a lawsuit being filed by Jason Boudreau was when I received in the mail the attached waiver of service of summons and complaint dated July 16, 2013. (Exhibit 5 - Affidavit of Steve Lussier, dated April 3, 2014.)

175. That in a sworn affidavit, Defendant Steve Lussier stated, "The earliest myself or any of the named employees from Automatic Temperature Controls Inc. was ever aware of a lawsuit being filed against us by Jason Boudreau, with the exception of Donald Lussier who was not named in the first complaint, was on or after July 16, 2011". (Exhibit 5 - Affidavit of Steve Lussier, dated April 3, 2014).

176. That in a court pleading, Defendants Steve Lussier, John Lussier, and Donald Lussier stated, "The ATC Defendants first notice of this lawsuit was when Plaintiff sent a copy of the original complaint and waiver of service of summons and complaint on or about July 16, 2013. Prior to July 2013, the ATC Defendants had no notice that they would be named as a defendant in a civil lawsuit brought by plaintiff. The ATC Defendants did not respond to the waiver of the summons and complaint." (Boudreau v. Lussier, Case No. 13-388S, Docket 94 at pg 3).

177. That Defendant Kevin Petit is a member of the Warwick Police Department. He is also a member of the Rhode Island State Police Inernet Crimes Against Children task force (RI ICAC).

178. That Defendant Kevin Petit is not a member of the Rhode Island State Police financial crimes unit.

179. That Automatic Temperature Controls, Inc is located at 95 Connecticut Street, in Cranston, Rhode Island.

180. That Defendant Steve Lussier does not reside in Warwick, Rhode Island.

181. That Defendant John Lussier does not reside in Warwick, Rhode Island.

15

182. That Defendant Donald Lussier does not reside in Warwick, Rhode Island.

183. That no shareholders of Automatic Temperature Controls, Inc. reside in Warwick, Rhode Island.

184. That the Cranston Police Department has jurisdiction to investigate any crime that occurs in Cranston, Rhode Island.

185. That the Warwick Police Department does not have jurisdiction in the City of Cranston, Rhode Island.

186. That the Cranston Police Department have jurisdiction to investigate any crime that occurs at Automatic Temperature Controls, Inc which is located at 95 Connecticut Street, Cranston, RI 02920.

187. That in July, 2013 Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit conspired to have the Plaintiff charged with the crime of embezzlement.

188. That Steve Lussier, Donald Lussier, John Lussier and Kevin Petit did conspire to have the Plaintiff charged with embezzlement in retaliation for the Plaintiff filing his wiretap and civil rights complaint against the Defendants.

189. That Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit did conspire to give false statements to police in order to fabricate probable cause against the Plaintiff.

190. That Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit did fabricate probable cause against the Plaintiff.

191. That on July 30, 2013 Defendant Steve Lussier met with Defendant Kevin Petit at the Rhode Island State police barracks in Scituate, Rhode Island.

192. That Defendants Steve Lussier and Kevin Petit met at the State police barracks on July 30, 2013, which was just <u>days</u> after the Defendants had received notice of the Plaintiff's lawsuit.

193. That Defendant Steve Lussier and Kevin Petit met at the State Police barracks on July 30, 2013, which was twenty-five (25) months after the Plaintiff was terminated by Automatic Temperature Controls, Inc.

194. That on July 30, 2013 Defendants Steve Lussier and Kevin Petit conspired to create a false police statement in order to fabricate probable cause against the Plaintiff.

195. That on July 30, 2013 Defendant Steve Lussier provided Defendant Kevin Petit with a police statement that contained false statements and factual omissions.

196. That rather than make a police complaint to the Cranston Police Dept, Defendant Steve Lussier chose to give the statement to a Warwick Police

detective, which was Defendant Kevin Petit, and Kevin Petit was also named in the lawsuit filed by the Plaintiff, and that Defendant Steve Lussier was Kevin Petit's co-defendant in that lawsuit.

197. That Defendant Steve Lussier's statement to Defendant Kevin Petit on July 30, 2013 is attached as Exhibit 6.

198. That on July 30, 2013 Defendant Kevin Petit asked Defendant Steve Lussier, "Did he have any authority to issue payroll checks?" Defendant Steve Lussier replied, "He did have authority to-to issue payroll checks, but he did not have authority to issue payroll bonus checks." (Exhibit 6 at pg 2)

199. That Defendant Steve Lussier's response contradicts documented evidence that the Plaintiff did issue bonus checks in 2010 and 2011, and those bonus checks were issued to several employees including Steve Lussier, John Lussier, Christine Bisson, Deborah Donahue, Mark Harrison, Aaron Simpson, Jason Misasizek and the Plaintiff. These bonus check payments are documented on ATC Inc's payroll reports for October 1, 2010 through June 24, 2011.

200. That Defendant Steve Lussier's statement in paragraph no. 198 was false and fabricated to create probable cause against the Plaintiff.

201. That on July 30, 2013 Defendant Kevin Petit asked Defendant Steve Lussier, "And how did the bonus checks work with - with the company, how were the bonuses applied to employees?" Defendant Steve Lussier replied, "The bonuses for employees, what would happen would be at the end of our fiscal year ends in June, bonuses would then be given out to key employees based upon performance of - and they were paid out from the period of June - you know, July 1st to September 15, per the tax code. And that - that goes out to, you know, like I said, the key employees".

202. That Defendant Steve Lussier's statement contradicts documented evidence that proves that the bonuses that were paid by ATC Inc were also paid from October 2010 to June 2011 and those bonus payments included bonus checks to Steve Lussier, John Lussier, Christine Bisson, Deborah Donahue, Jason Misasizek, Dave Ditusa, Mark Harrison, George Lackey, Kent Novak, Matthew Richardson, Aaron Simpson, Steve Sorel, and the Plaintiff.

203. That Defendant Steve Lussier's statement in paragraph no. 201 was false and fabricated to create probable cause against the Plaintiff.

204. That the 'year end' bonus was paid in July 1 through September 15, 2010 to key managers including the Plaintiff, Michael White, Robert Martel, Steve Lussier and John Lussier.

205. That in Steve Lussier's sworn police statement on July 30, 2013 he states that bonuses were not distributed outside of July through September.

206. That Defendant Steve Lussier's statement in paragraph no. 205 contradicts the documented evidence that employees of ATC Inc. received bonus checks from October through June including, but not limited to, Steve Lussier John Lussier, Jason Misasizek, the Plaintiff, Mark Harrison and Christine Bisson.

207. That in his sworn police statement, Steve Lussier states that any bonus payments outside of July through September would not have been within company police or authorized. (Exhibit 6 at pg 3)

208. That ATC Inc payroll documents conclusively prove that bonus payments were in fact, paid outside of July through September, and they were paid in October through June, and that such payments included bonuses to Steve Lussier, John Lussier, the Plaintiff, Mark Harrison, Aaron Simpson, Jason Misasizek, Christine Bisson, Steve Sorel, Scott Petrarca, and other employees of ATC Inc.

209. That Defendant Steve Lussier's statement in paragraph nos. 205 and 207 were false and fabricated to create probable cause against the Plaintiff.

210. That on July 30, 2013 Defendant Kevin Petit asked Defendant Steve Lussier, "Can you tell me what the performance was during the course of his employment as far as entitlement to bonuses?" Steve Lussier replied, "Well, the first year he was-he did the-he did the job, and the cost numbers came down on the books, so he was paid out a bonus for that year. The second year, because we had done all the cost cutting, there was really no- not a lot of room for a bonus based upon this structure. And we actually did not reach the end of that year before he was-he was, you know, terminated from the company, and bonuses were paid out to him by his own hand before that June 30th - the September 15th timeframe for-for absolutely no reason at all." (Exhibit 6 at pg 3)

211. That Defendant Steve Lussier's statement in paragraph 210 contradicts the audited financial statements provided by John Clegg & Company of ATC Inc's 2010 - 2011 fiscal year. Those financials show that ATC Inc enjoyed substantial cost savings in 2010 - 2011. Those financials show that the gross profit for year 2010-2011 increased by one-hundred and nine percent (109%). Those financials show that the net profit for year 2010-2011 increased by one hundred and one percent (101%) over fiscal year 2009-2010. Those financials show that the operating expenses in 2010-2011 decreased by $1,654,081. That those financials show, when adjusted to revenue, ATC Inc had a 4% decrease in operating expenses from fiscal year 2009-2010 to 2010-2011. That reduction amount equaled $343,824. That the Plaintiff's cost savings bonus was $34,382 based on the bonus plan from 2009.

212. That Steve Lussier's statement in paragraph no. 210 was false and was fabricated to create probable cause  against the Plaintiff.

213. That the financial reports referenced in paragraph no. 211 were created by the accounting firm, John Clegg & Company in February 2012, which was nearly two years before Defendant Steve Lussier's statements.

214. That despite the Plaintiff and ALL employees being eligible for bonus payments during October 2010 and June 2011, Steve Lussier, in his statement to Defendant Kevin Petit, states that all such bonuses were not authorized.

215. That ALL employees received bonuses from October 2010 to June 2011. Those bonuses included payments to Steve Lussier himself.

18

216. That ATC Inc payroll records prove that ALL employees received bonuses from October 2010 to June 2011.

217, That Defendant Steve Lussier did not discuss those bonus payments in his statement to Defendant Kevin Petit on July 30, 2013.

218. That Defendant Steve Lussier tells Defendant Kevin Petit in his July 30, 2013 statement that the Christmas bonus paid to employees, including payments to Steve Lussier and John Lussier were not authorized. ATC Inc records show that Christmas bonuses were paid to office and management employees on December 13, 2010 in the amount equal to one-week salary.

219. That Defendant Steve Lussier lied about the Christmas bonus payments in order to fabricate probable cause against the Plaintiff.

220. That Defendant Steve Lussier states in his police statement on July 30, 2013 that the Plaintiff was not eligible for payment of his bonus until the end of June 2011. This contradicts the actual policy implemented at at ATC Inc after June 2010 to pay bonuses throughout the year to avoid having large expenses in only one month, and to recognize the bonuses in the months they are earned, in accordance with matching accounting principle.

221. That Defendant Steve Lussier states in his police statement on July 30, 2013 that the alleged embezzlement by the Plaintiff was found during 2011. (Exhibit 6, page 8)

222. That on page 8 and 9 of the police statement of Steve Lussier, Steve Lussier and Kevin Petit discuss the Plaintiff's expectation of privacy in his office and office computer at ATC Inc.

223. That the Plaintiff's expectation of privacy in his office and office computer was irrelevant to the embezzlement charge.

224. That Defendant Steve Lussier and Kevin Petit discussed the expectation of privacy because it was highly relevant to the Plaintiff's 2013 lawsuit filed against Steve Lussier and Kevin Petit.

225. That Defendant Steve Lussier in his statement on July 30, 2013 accuses the Plaintiff of embezzlement from checks that were paid to Town Fair Tire in 2010 and 2011.

226. That the checks to Town Fair Tire were for tires for ATC Inc vehicles, and that those vehicle repairs were managed by the Plaintiff.

227. That Defendant Steve Lussier's statements in paragraphs nos. 218, 220, and 225 were false and fabricated to create probable cause against the Plaintiff.

228. That the Plaintiff, in managing repairs for the over thirty (30) ATC Inc vehicles, at certain times needed to pay repair shops cash if they did not accept ATC Inc checks.

229. That Defendant Steve Lussier did not provide the general ledger entries for any checks written to the Plaintiff in 2010 and 2011 to the police at any time, as such evidence would be exculpatory to the Plaintiff.

230. That in his police statement on July 30, 2013, Steve Lussier states that the company had a very little profit for 2010-2011. (Exhibit 6, pg 13-14)

231. That Steve Lussier's statement in paragraph no. 230 contradicts the ATC Inc financial statements in which the 2010-2011 profits were substantially higher than 2009-2010.

232. That in his sworn police statement, Defendant Steve Lussier falsely states the financial status of ATC Inc in 2010-2011.(Exhibit 6, pages 13-14).

233. That the ATC Inc financial statements show for fiscal year 2010-2011: (1) that the gross profit from sales increased from six -percent (6%) to fourteen-percent (14%); (2) That gross profit increased by one-hundred and nine percent (109%); (3) that total liabilities decreased by fourteen percent (14%); (4) that income from operations increased by one-hundred and twenty-seven percent (127%); (5) that net income increased by one-hundred and one percent (101%).

234. That the overall financial health of ATC Inc increased while the Plaintiff worked at ATC Inc, as proven by the ATC Inc financial statements that were compiled by accounting firm John Clegg & Company.

235. That Defendant Steve Lussier's statement of "You don't take bonuses from a company that's, you know, not in good financial standing at the time", (Exhibit 6, pg 14) is contradictory of ATC Inc's financial statements and bonuses that were paid to all employees in 2010-2011.

236. That the financil achievements listed in paragraph no. 233 were AFTER all of the bonuses were paid to employees in 2010-2011.

237. That Defendant Steve Lussier did not provide the police with any of the payroll records for the over fifty other employees that had received bonuses during 2010 and 2011.

238. That after July 30, 2013, Defendant Kevin Petit and Steve Lussier did conspire to have the Plaintiff charged with embezzlement.

239. That after July 30, 2013, Defendants Kevin Petit and Steve Lussier did conspire with Defendants James Brown and Nicholas Rivello to have the Plaintiff charged with embezzlement with fabricated probable cause.

241. That on April 16, 2014 Defendants James Brown and Nicholas Rivello did interview Defendant Steve Lussier at the Rhode Island State Police barracks in Scituate, RI (Exhibit 7 - Steve Lussier Witness Statement, April 16, 2014).

242. That in that witness statement, Defendant Steve Lussier states that the Plaintiff was entitled to a bonus for trimming costs (Exhibit 7, pg 3-4)

243. That in that witness statement, Defendant Steve Lussier states that other employees were entitled to bonuses. (Exhibit 7 at pg 4)

244. That Defendant Steve Lussier did not include information about the other employee bonuses in his statement on July 30, 2013.

245. That in the April 16, 2014 witness statement, Defendant Steve Lussier states that other bonus plans existed based on the financial performance of each project and states the bonus was two-percent (2%) of the profit. (Exhibit 7 at pg 4)

246. That in that witness statement, Defendant Steve Lussier states how the cost savings were adjusted by sales volume. (Exhibit 7 at pg 5).

247. That in that witness statement, Defendant Steve Lussier states that there were no savings from fiscal year 2009-2010 to 2010-2011. (Exhibit 7 at page 7).

248. That Defendant Steve Lussier's statement utterly contradicts the ATC Inc financial statements that were produced by accounting firm John Clegg & Company for fiscal year 2010-2011.

249. That Defendant Steve Lussier falsely stated that the company did not have any cost savings from fiscal year 2009-2010 to fiscal year 2010-2011.

250. That Defendant Steve Lussier made such false statement in order to fabricate probable cause against the Plaintiff.

251. That Defendant Steve Lussier stated in that witness statement that since there were no cost savings that the Plaintiff was not entitled to a bonus.

252. That such statement by Steve Lussier contradicts the ATC Inc financial statements that were produced by accounting firm John Clegg & Company.

253. That the Plaintiff was entitled to a bonus for cost savings for fiscal year 2010-2011 as the cost savings was substantial, according to the financial statements of ATC Inc.

254. That in the April 16, 2014 witness statement, Steve Lussier states that employees DID receive bonuses from October 2010 through June 2011, and that such statement contradicted Defendant Steve Lussier's sworn witness statement on July 30, 2013. (Exhibit 7, pg 8).

255. That in the April 2014 statement, Defendant Steve Lussier states that the bonuses from October 2010 to June 2011 were small, yet those bonuses were in fact substantial, and that the amounts exceeded $1,000 for employees such as Matthew Richardson, David Ditusa, Mark Harrison, William Horne, Steven Guilmette, Steve Lussier, Jason Misasizek, John Lussier, and some bonuses to Steve Lussier, John Lussier, and Jason Misasizek exceeded $3,000 each with some as high as $10,000.

256. That in that witness statement, Steve Lussier falsely states that the Plaintiff was not entitled to any project bonus. (Exhibit 7, pg 8)

257. That Defendant Steve Lussier made such false statements in order to fabricate probable cause against the Plaintiff.

258. That in his April 16, 2014 statement, Defendant Steve Lussier states that between December 2010 and June 2011 that the Plaintiff was paid bonuses totalling $34,000. (Exhibit 7 at pg 9)

259. That in his witness statement, Steve Lussier states that the Plaintiff's weekly salary was fourteen hundred dollars per week ($1,400) which contradicts his letter to Helen Gage on July 11, 2011.

260. That the only probable cause that the police had for an embezzlement charge against the Plaintiff was based soley on Defendant Steve Lussier's statements, and such statements were fabricated and falsified for the sole purpose of creating false probable cause against the Plaintiff.

261. That ATC Inc payroll, general ledger, and financial statements contradict the witness statements of Defendant Steve Lussier.

262. That on May 14, 2014 Defendant James Brown did obtain a search warrant, knowing or having reason to know, that such warrant lacked probable cause.

263. That such search warrant sought any and all bank records of the Plaintiff from September 1, 2010 to June 30, 2011.

264. That such a search without probable cause invaded the Plaintiff's privacy.

265. That such a search warrant based on fabricated probable cause did violate the Plaintiff's civil rights.

266. That on June 11, 2014 the Plaintiff was arrested by Defendant James Brown and charged with embezzlement.

267. That at no time during either the July 30, 2013 or April 16, 2014 witness statements by Steve Lussier did Steve Lussier state, for the record, that he was being sued by the Plaintiff.

268. That the Defendants did publicize the Plaintiff's arrest in an effort to damage the Plaintiff's reputation as an accountant.

269. That Defendant City of Warwick did not authorize Defendant Kevin Petit to investigate a claim of embezzlement against the Plaintiff in July 2013

270. That Defendant Warwick Police Department did not authorize Defendant Kevin Petit to investigate a claim of embezzlement against the Plaintiff in July 2013.

271. That prior to July 2013, that Defendant Kevin Petit did not handle any embezzlement investigations for the Rhode Island State Police.

272. That Defendant Kevin Petit is not a member of the Rhode Island State Police financial crimes unit.

273. That the Warwick Police Department does not investigate claims of embezzlement that allegedly occurs in the City of Cranston.

274. That Warwick Police officers do not investigate claims of embezzlement that allegedly occurs in the City of Warwick.

275. That the Rhode Island State Police Internet Crimes Against Children Task Force (RI ICAC) does not investigate claims of embezzlement that occur in Rhode Island.

276. That no other members of (RI ICAC) task force participated in the embezzlement investigation of the Plaintiff in 2013 & 2014.

277. That Defendant Kevin Petit was the only member of the RI ICAC task force to participate in the embezzlement investigation of the Plaintiff.

278. That Defendant Kevin Petit initiated the criminal investigation of embezzlement against the Plaintiff in 2013.

279. That Defendant Steve Lussier contacted Defendant Kevin Petit directly to make his embezzlement complaint against the Plaintiff.

280. That Defendant Steve Lussier and Defendant Kevin Petit agreed to meet at the Rhode Island State Police barracks in Scituate, RI on July 30, 2013 to make the criminal complaint against the Plaintiff.

281. That no other police officer took part in the investigation and interview of Defendant Steve Lussier on July 30, 2013 other than Defendant Kevin Petit.

## COUNT 1 - Retaliation in Violation of 42 U.S.C. §1983

Defendants: Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit

282. That Plaintiff incorporates the allegations contained in paragraphs 12 through 281 of this Complaint into this First Cause of Action.

283. That the Plaintiff's filing of his civil lawsuit in 2013 against Defendants Steve Lussier, John Lussier, and Kevin Petit was constitutionally protected.

284. The right to petition the government through a lawsuit is "among the most precious of liberties safeguarded by the Bill of Rights", United Mine Workers v. Ill. State Bar Ass'n, 389 U.S. 217, 222.

285. That Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit filed a criminal complaint against the Plaintiff only fourteen (14) days after receiving notice of the Plaintiff's lawsuit against the Defendants.

286. That the Plaintiff asserts that facing criminal charges was injury caused by the retalitory conduct of the Defendants and Plaintiff also contends that defending himself against the charges undoubtedly made it more difficult for him to pursue and prevail on his civil claim.

287. That the Plaintiff suffered adverse action by having a criminal complaint filed against him by the Defendants in retaliation for the Plaintiff's filing of a lawsuit against the Defendants.

288. That the Defendants were aware of the Plaintiff's lawsuit against them on or about July 16, 2013, and that the Defendants filed their criminal complaint against the Defendant fourteen (14) days later on July 30,2013.

289. "In order to succeed on a First Amendment retaliation claim, a party must show that his conduct was constitutionally protected, and that his conduct was a substantial factor or motivating factor driving the allegedly retaliatory" conduct, Gorelik v. Costin, 605 F.3d 118, 123 (1st Cir 2011)

290. "In order to state a claim for retaliation a plaintiff must allege that 1) his conduct was constitutionally protected; 2) he suffered an adverse action; and 3) there was a causal connection between the conduct and the adverse action such that the conduct was a motivating factor for the adverse action", Aziz Zarif Shabazz v. Pico, 993 F.Supp. 460, 468 (SDNY 1998).

291. "The third element of a retaliation claim is a causal connection between the protected conduct and the adverse action. This element is satisfied where the adverse action was motivated at least in part by the plaintiff's protected conduct", Brown v. Crowley, 312 F.3d 782, 790 (6th Cir. 2002.)

292. "A Plaintiff may also establish the required causal connection indirectly by showing that the protected activity was followed closely in time by the adverse action", Feingold v. New York, 366 F.3d 138, 156-157 (2nd Cir. 2004).

293. See, Ramirez v. Oklahoma Dep't of Mental Health, 41 F.3d 584, 596 (10th Cir. 1994)(holding evidence of adverse employment actions a month and a half after engaging in protected activity to be circumstantial evidence of retaliation).

294. That the Defendants created the criminal complaint against the Plaintiff only fourteen (14) days after receiving notice of the Plaintiff's civil lawsuit against the Defendants.

295. That the Plaintiff's filing of his lawsuit was a motivating factor in the Defendants decision to file a criminal complaint against the Plaintiff fourteen (14) days after receiving notice of the lawsuit.

296. That twenty-five months had lapsed between the Plaintiff's termination at ATC Inc and the filing of the Defendants criminal complaint.

297. "Citizens have a First Amendment right to engage in certain kinds of speech, including the filing of civil actions", Gonzalez-Droz v. Gonzales-Colon, 660 F.3d 1, 16 (1st Cir. 2011) "Claims of retaliation for the exercise of First Amendment rights are cognizable under 1983", Powell v. Alexander, 391 F.3d 1, 16.

298. That the Plaintiff first became aware of the July 30, 2013 criminal complaint on June 11, 2014 when the Plaintiff was arrested on a charge

of embezzlement from that criminal complaint.

299. That the Defendants willfully and intentionally filed a criminal complaint against the Plaintiff fourteen (14) days after the Defendants received notice of the Plaintiff's lawsuit against them.

300. That the Defendants violated the Plaintiff's civil rights by filing a criminal complaint against the Plaintiff in retaliation for the Plaintiff filing a civil lawsuit against the Defendants.

301. That the Defendants willfully and intentionally, with reckless disregard of the possible results of their conduct, did file a criminal complaint fourteen (14) days after receiving notice of the Plaintiff's lawsuit against the Defendants.

302. That the Defendants filed a criminal complaint of embezzlement against the Plaintiff to ensure that the Plaintiff could never work as an accountant in the future.

303. That the retaliatory conduct of the Defendants has adversely affected the Plaintiff's ability to find gainful employment.

304. That the retaliatory conduct of the Defendants will adversely affect the Plaintiff's ability to find gainful employment in the future.

305. That the retaliatory conduct of the Defendants was also motivated by malice, spite, ill-will and wanton disregard for the Plaintiff's rights.

306. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, loss of business opportunities, loss of reputation and standing, loss of earning capacity, embarassment, false light, financial loss, and financial hardship.

307. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit, and each of them, jointly and severally as follows:
    (a) Compensatory Damages of $1,500,000.00
    (b) Treble Punitive damages of $4,500,000.
    (c) Pre-judgment and post-judgment interest as allowed by law
    (d) Any additional relief deemed just and proper by the Court.

<u>COUNT 2 - Conspiracy to Retaliate Against Plaintiff for Filing of a Lawsuit in Violation of 42 USC 1983 & 1985</u>

Defendants: Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit

308. That a civil conspiracy is defined as "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principle element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage", Baker v. Smith, 771 F.Supp at 1158.

309. Plaintiff incorporates the allegations in paragraphs 12 through 307 of this Complaint into this Second Cause of Action.

310. That the Defendants did conspire to file a criminal complaint against the Plaintiff in retaliation for the Plaintiff filing a lawsuit against the Defendants.

311. That the Defendants did conspire in 2013 to have the Plaintiff charged with embezzlement in retaliation for the Plaintiff filing a lawsuit against the Defendants.

312. That rather than file such criminal complaint with the Cranston Police, the Defendants conspired to have Defendant Kevin Petit of the Warwick Police handle the complaint because Kevin Petit was a defendant in the Plaintiff's 2013 lawsuit.

313. That the Warwick Police Department did not authorize Defendant Kevin Petit to investigate a claim of embezzlement against the Plaintiff in July, 2013.

314. That Defendant Kevin Petit had not, prior to July 2013, handled any embezzlement investigations for the Rhode Island State Police.

315. That in July 2013, the Defendants agreed to file a criminal complaint against the Plaintiff.

316. That in July 2013, the Defendants agreed to file a criminal complaint against the Plaintiff in retaliation for the Plaintiff filing a civil lawsuit against the Defendants.

317. That the Defendants conspired to make claims in the criminal complaint regarding the Plaintiff's expectation of privacy in his ATC Inc office computer even though such expectation of privacy was irrelevant to the criminal complaint of embezzlement.

318. That the Defendants conspired to make claims in the criminal complaint regarding the Plaintiff's expectation of privacy in his ATC Inc office computer because such an expectation of privacy was a major factor in the Plaintiff's 2013 lawsuit against the Defendants.

319. That the Defendants did file a criminal complaint of embezzlement against the Plaintiff in retaliation for the Plaintiff filing a lawsuit against the Defendants.

320. That the Defendants did file a criminal complaint of embezzlement against the Plaintiff that included claims regarding the Plaintiff's expectation of privacy in his ATC Inc office computer even though such expectation of

26

privacy was irrelevant to the Defendants embezzlement claims.

321. "Private parties involved in such a conspiracy may be liable under 1983", <u>United Steelworkers of Am. v. Phelps Dodge Corp.</u>, 865 F.2d 1539, 1540.

322. "Because conspiracies are often carried out clandestinely and direct evidence is rarely available" the law allows plaintiff's to "use circum-stantial  evidence to establish a conspiracy", <u>Bearman v. Freesmeyer</u>, 776 F.3d 500, 511 (7th 2014).

323. "In some situations, a jury may reasonably infer that the circumstances in which the alleged constitutional deprivation occured could only have arisen by means of conspiracy", <u>Collier v. City of Chicago</u>, 2015 U.S. Dist. LEXIS 113336 (7th Cir. 2015)

324. That the Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to retaliate against the Plaintiff for the Plaintiff's filing of a civil lawsuit against them by filing a criminal complaint against the Plaintiff fourteen (14) days after the Defendants received notice of the Plaintiff's lawsuit.

325. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

326. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit, and each of them, jointly and severally as follows:
    (a) Compensatory Damages of $100,000.
    (b) Treble Punitive damages of $300,000.
    (c) Pre-judgment and post judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.

### COUNT 3 - Abuse of Process

Defendants: Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit

327. Plaintiff incorporates the allegations in paragraphs 12 through 326 of this Complaint in this Third Cause of Action.

328. That on July 30, 2013 the Defendants initiated a criminal complaint against the Plaintiff in retaliation for the Plaintiff filing a civil lawsuit against the Defendants.

329. That the Defendants did initiate the criminal complaint only fourteen (14) days after they received notice of the Plaintiff's lawsuit against them.

330. That the Defendants did improperly use the court's process in order to retaliate against the Plaintiff for the Plaintiff's filing of a lawsuit against the Defendants

331. That the Defendants had an ulterior motive in using the court's process, and such motive was to retaliate against the Plaintiff for the Plaintiff filing a lawsuit against the Defendants.

332. That the Plaintiff suffered damages as a direct result of the Defendants abuse of process.

333. "The element of the tort of abuse of process are (1) that 'process' was used against plaintiff; (2) for an 'ulterior' or 'illegitimate purpose' and (3) that some harm occured as a result", Fontanez v. City of Worcester, 2012 U.S. Dist. LEXIS 188626 (D.Ma 2012) "The essence of this tort is the malicious use of legal process to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed", Id.

334. The essence of the tort of abuse of process is "not the wrongfulness of the prosecution, but some extortionate perversion of lawfully initiated process to illegitimate ends", Heck v. Humphrey, 512 U.S. 477, 485 n.5, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

335. That the Plaintiff first discovered the abuse of process on June 11, 2014 when the Plaintiff was arrested.

336. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

337. Defendants  acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Planitff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit, and each of them, jointly and severally as follows:
   (a) Compensatory Damages of $100,000
   (b) Treble punitive damages of $300,000.
   (c) Pre-judgment and post-judgment interest as allowed by law.
   (d) Any additional relief deemed just and proper by the Court.


COUNT 4 - Deliberate Fabrication of False Evidence

Defendants: Steve Lussier, Kevin Petit

338. Plaintiff incorporates the allegations in paragraphs 12 through 337 of this Complaint in this Fourth Cause of Action.

339. That on July 20, 2013 Defendant Steve Lussier did give a statement to Defendant Kevin Petit that contained false testimony.

340. That on July 30, 2013 Defendants Steve Lussier and Kevin Petit did fabricate false evidence against the Plaintiff by producing payroll reports of legitimate pay and falsely claiming that such pay was not authorized.

341. That on July 30, 2013 Defendant Steve Lussier falsely stated that the Plaintiff did not have the authority to issue payroll bonus checks when in reality the Plaintiff was authorized to issue payroll bonus checks to numerous employees including Defendants Steve Lussier and John Lussier as well as to Christine Bisson, Mark Harrison, Jason Misasizek, Deborah Donahue, and Matthew Richardson.

342. That on July 30, 2013 Defendant Steve Lussier falsely stated that the company only issued bonus payroll checks from July to September of each year even though payroll bonus checks were actually issued year-round and such payments included multiple bonuses to numerous employees from October 2010 to June 2011, including Steve Lussier, John Lussier, Jason Misasizek, Christine Bisson, Aaron Simpson, Mark Harrison, Matthew Richardson, Deborah Donahue, and David Ditusa.

343. That on July 30, 2013 Defendant Steve Lussier falsely stated that any bonus payments outside of July through September would not have been authorized, which contradicts the numerous bonus payments made from October through June to over 30 different employees, including Defendants John Lussier and Steve Lussier themselves.

344. That in his July 30, 2013 statement, Defendant Steve Lussier makes no mention of the numerous bonuses legitimately paid to himself and numerous other employees from October 2010 to June 2011.

345. That on July 30, 2013 Defendant Steve Lussier falsely stated that no cost cutting was done for fiscal year 2010-2011, which contradicts the ATC Inc financial statements that show an adjusted cost savings of $343,824.

346. That on July 30, 2013, Defendant Steve Lussier falsely stated that the Plaintiff was not entitled to a year end bonus, which contradicts the ATC Inc Financial statements that show the the Plaintiff was entitled to a year end bonus of $34,382.

347. That on July 30, 2013 Defendant Steve Lussier falsely stated the the Plaintiff's Christmas bonus that was paid in December 2010 was not authorized, however Steve Lussier did authorize those bonuses that all ATC Inc management received in December 2010, including Jason Misasizek, Michael White, Christine Bisson, and Deborah Donahue.

348. That on July 30, 2013 Defendant Steve Lussier falsely states that the Plaintiff was not entitled to the cost savings bonus until year end, which contradicts ATC Inc's policy in 2010-2011 to utilize the "matching" accounting principle in regards to bonus payments.

349. That on July 30, 2013 Defendant Steve Lussier falsely stated tha the company had very little profit for year 2010-2011, which contradicts the

29

ATC Inc financial statements that show substantial increases in profit year over year as detailed in paragraph number 233.

350. That on July 30, 2013 Defendant Steve Lussier falsely stated that the company was not in good financial standing, which contradicted the ATC Inc financial statements.

351. That Defendant Steve Lussier did not provide police with payroll records of other employees that received bonuses from October 2010 to June 2011.

352. That on July 30, 2013 Defendant Steve Lussier did not provide police with the ATC Inc financial statements.

353. That on July 30, 2013 Defendant Steve Lussier falsely stated that the Plaintiff received bonuses that he was not entitled to in order to fabricate probable cause.

354. That on July 30, 2013 Defendant Steve Lussier falsely stated that the Plaintiff received bonuses that he was not entitled to in reliatation for the Plaintiff filing a lawsuit against the Defendant.

355. That on April 16, 2014 Defendant Steve Lussier falsely stated that there were no savings from fiscal year 2009-2010 to 2010-2011, and that such false statement is contradicted by the ATC Inc financial statements that prove an adjusted savings over $343,000.

356. That in both of his witness statements, Defendant Steve Lussier omits that ATC Inc utilized the "matching principle" when paying bonuses in 2010 and 2011.

357. "The matching principle requires that all expenses incurred in the generating of revenue should be recognized in the same accounting period as the revenues are recognized", In re Burlington Coat Factory SEC Litig., 114 F.3d 1410, 1420.

358. That although ATC Inc was not a public corporation, that the Plaintiff in 2010 to 2011 did work diligently to have ATC Inc conform to the Financial Accounting Standards Board (FASB) concepts and Generally Accepted Accounting Principles (GAAP) in order to provide ATC Inc ownership and outside parties (banks, bonding companies) with accurate monthly and quarterly financial statements.

359. That bonuses to numerous employees paid from October 2010 to June 2011 were designed to comply with the matching principle.

360. That on April 16, 2014 Defendant Steve Lussier states that bonuses were paid October 2010 to June 2011 which directly contradicts his July 30, 2013 statement.

361. That in his witness statements, Defendant Steve Lussier omits that the Plaintiff was entitled to bonuses based on project performance.

362. That the Plaintiff first learned of the false evidence on June 11, 2014.

363. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

364. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier and Kevin Petit, and each of them, jointly and severally as follows:
   (a) Compensatory Damages of $100,000.
   (b) Treble punitive damages of $300,000.
   (c) Pre-judgment and post judgment interest as allowed by law.
   (d) Any additional relief deemed just and proper by the Court.


COUNT 5 - Conspiracy to Fabricate Probable Cause
Defendants: Steve Lussier, John Lussier, Donald Lussier, James Brown, Nicholas Rivello

365. Plaintiff incorporates the allegations in paragraph 12 through 364 of this Complaint into this Fifth Cause of Action.

366. That on or about April 16, 2013 the Plaintiff sent a notice of intent to sue to the Warwick Police Department.

367. That on or about April 28, 2013 the Warwick Police sent a letter to the Plaintiff stating that they were begining an investigation of the Plaintiff's complaint against Kevin Petit.

368. That on May 28, 2013 the Plaintiff filed a Complaint with the United States District Court.

369. That on or about July 16, 2013 Defendants Steve Lussier, John Lussier, Donald Lussier and Kevin Petit received notice of the Plaintiff's lawsuit against them.

370. That on or about July 16, 2013 the Defendants did conspire to retaliate against the Plaintiff for the Plaintiff's filing of a lawsuit against the Defendants.

371. That on or about July 16, 2013 the Defendants did conspire to fabricate statements amongst themselves to fabricate probable cause against the Plaintiff.

372. That on or about July 16, 2013 the Defendants did conspire to have the Plaintiff falsely charged with embezzlement in retaliation for the Plaintiff filing a lawsuit against the Defendants.

373. That the Defendants conspired and entered into express and/or implied

agreements, understandings, or meetings of the minds among themselves for the purpose of retaliating against the Plaintiff for the Plaintiff's filing of a lawsuit against the Defendants.

374. That on July 30, 2013 Defendant Steve Lussier met with Kevin Petit to create a false witness statement against the Plaintiff.

375. That on July 30, 2013 Defendants Steve Lussier and Kevin Petit did create false statements against the Plaintiff.

376. That such false statements included false testimony that contradicted the ATC Inc payroll reports and financial statements.

377. That on or after July 30, 2013 Defendants Steve Lussier and Kevin Petit did conspire with Defendants James Brown and Nicholas Rivello to create false statements in order to fabricate probable cause against the Plaintiff.

378. That on April 16, 2014 Defendant Steve Lussier did give a false statement to Defendants James Brown and Nicholas Rivello and such statement did contradict Steve Lussier's July 30, 2013 statement and did contradict ATC Inc's payroll reports and financial statements, and that such false statement was designed to create false probable cause against the Plaintiff

379. That Defendant Steve Lussier's July 30, 2013 and April 16, 2014 statements were deliberately falsified and no probable cause existed to charge the Plaintiff.

380. That although Defendants Kevin Petit, James Brown, and Nicholas Rivello knew such probable was fabricated they still intentionally and willfully charged the Plaintiff with embezzlement.

381. That the Plaintiff first learned of the conspiracy only after receiving the statements and related documents through discovery in the embezzlement case in 2016.

382. That Defendants Kevin Petit, James Brown, and Nicholas Rivello were aware that Steve Lussier provided false testimony on July 30, 2013 and April 16, 2014.

383. That Defendants Kevin Petit knowingly used Steve Lussier's false statement in his police investigation in 2013.

384. That Defendants James Brown and Nicholas Rivello used Steve Lussier's false statements in their police investigation in 2013 and 2014.

385. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false  light, financial loss, and financial hardship.

386. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their

conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown and Nicholas Rivello, and each of them, jointly and severally as follows:
  (a) Compensatory Damages of $100,000.
  (b) Treble punitive damages of $300,000.
  (c) Pre-judgment and post-judgment interest as allowed by law.
  (d) Any additional relief deemed just and proper by the Court.


## COUNT 6 - Bad Faith Destruction of Evidence

Defendants: Steve Lussier, John Lussier and Donald Lussier.

387. Plaintiff incorporates the allegations in paragraph 12 through 386 of this Complaint into this Sixth Cause of Action.

388. That on or about June 18, 2013 Defendants Steve Lussier, John Lussier, and Donald Lussier did willfully and intentionally destroy material evidence that was exculpatory for the Plaintiff's embezzlement charge.

389. That on or about June 18, 2013 Defendants Steve Lussier, John Lussier and Donald Lussier did destroy all of the Plaintiff's ATC Inc emails and email account for email address jboudreau@autotempcontrols.com

390. That Defendants Steve Lussier, John Lussier, and Donald Lussier did destroy the Plaintiff's 'jboudreau@autotempcontrols.com' email account and associated emails, knowing or having reason to know that such emails were material to the guilt or innocence of the Plaintiff.

391. That Defendants Steve Lussier, John Lussier, and Donald Lussier did destroy the Plaintiff's 'jboudreau@autotempcontrols.com' email account and associated emails intentionally and maliciously, knowing or having reason to know that such emails were material exculpatory evidence to the Plaintiff.

392. That the Defendants did willfully, intentionally, and maliciously destroyed material evidence that was favorable to the Plaintiff.

393. That the Defendants intentionally destroyed such emails and email account because such emails would prove that no probable cause existed to charge the Plaintiff with embezzlement.

394. That such deleted and destroyed emails contained evidence of bonus checks paid to numerous employees including the Plaintiff.

395. That such deleted and destroyed emails contained evidence of how each and every bonus check was calculated.

396. That such deleted and destroyed emails utterly contradict Steve Lussier's July 30, 2013 and April 16, 2014 .

397. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

398. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, and Donald Lussier, and each of them, jointly and severally as follows:
   (a) Compensatory Damages of $100,000.
   (b) Treble punitive damages of $300,000.
   (c) Pre-judgment and post-judgment interest as allowed by law.
   (d) Any additional relief deemed just and proper by the Court.


## COUNT 7 - Obstruction of Justice

Defendants: Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit.

399. Plaintiff incorporates the allegations in paragraps 12 through 396 of this Complaint into this Seventh Cause of Action.

400. That Defendants Steve Lussier, John Lussier, Donald Lussier and Kevin Petit conspired to create false statements against the Plaintiff.

401. That Defendants John Lussier, Steve Lussier, and Donald Lussier did intentionally destroy material exculpatory evidence favorable to the Plaintiff.

402. That Defendants did conspire to impede the legal justice system through false statements.

403. That Defendants did impede the legal justice system through false statements.

404. That the Defendants did conspire to impede the legal justice system by intentionally destroying records and evidence.

405. That the defendants did impede the legal justice system by intentionally destroying records and evidence.

406. That the Defendants did conspire to impede the legal justice system by intentionally concealing material evidence.

407. That the Defendants did impede the legal justice system by intentionally concealing material evidence.

408. That Defendants Kevin Petit and Steve Lussier obstructed justice by manufacturing false and misleading evidence that impaired the judicial process.

409.

409. That Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves for the purpose of impeding, hindering, obstructing, and defeating the due cause of justice in the State of Rhode Island, with the intent to deny the Plaintiff the equal protection of the laws.

410. That Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds, among themselves to deprive Plaintiff of his constitutional rights by charging and prosecuting him on an embezzlement charge which Defendants knew was not supported by probable cause.

411. That Defendants did deprive the Plaintiff of his civil rights by charging the Plaintiff with embezzlement when the Defendants knew or had reason to know that such a charge was not supported by probable cause.

412. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrasment, loss of business opportunties, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

413. That the Plaintiff first learned of the details surround this cause of action when he received discovery in 2016 in the embezzlement case.

414. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing Defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier and Kevin Petit, and each of them, jointly and severally as follows:
    (a) Compensatory Damages of $100,000.
    (b) Punitive damages of $300,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.


COUNT 8 - Denial of Right to a Fair Trial

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James
            Brown, Nicholas Rivello, Rhode Island State Police, Warwick Police
            Department.

415. Plaintiff incorporates the allegations in paragraphs 12 through 414 of the Complaint into this Eighth Cause of Action.

416. That Defendants conspired and entered into express and/or implied agreements, understandings, or meetings of the minds among themselves to fabricate statements and evidence in order to fabricate probable cause against the Plaintiff, whereby denying the Plaintiff the right to a fair trial.

417. Defendants Steve Lussier, Kevin Petit, and James Brown violated the Plaintiff's right to a fair trial by swearing out false statements against Plaintiff in accusatory instruments.

418. Defendants violated the Plaintiff's right to a fair trial by intentionally and maliciously destroying material exculpatory evidence.

419. Defendants violated the Plaintiff's right to a fair trial by intentionally and maliciously concealing material exculpatory evidence.

420. Defendants violated the Plaintiff's right to a fair trial by creating false information and forwarding such false information to prosecutor's and that such false information was likely to influence a jury's decision.

421. That the Rhode Island Attorney General chose to prosecute the Plaintiff based on the false statements and false evidence that was created by the Defendants.

422. That Defendants violated the Plaintiff's right to a fair trial by obtaining search warrants with false affidavits knowing or having reason to know that such affidavits contained material false statements and omissions.

423. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

424. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police, and the Warwick Police Department, and each of them, jointly and severally, as follows:
    (a) Compensatory damages of $100,000.
    (b) Treble punitive damages of $300,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.


COUNT 9 - Retaliatory Inducement to Prosecute for Exercise of First
            Amendment

425. Plaintiff incorporates the allegations in paragraphs 12 through 424 in this Complaint into this Ninth Cause of Action.

426. That in July 2013, after receiving notice of the Plaintiff's lawsuit against him, Defendant Kevin Petit conspired with Defendants Steve Lussier, John Lussier, and Donald Lussier to create false statements and evidence

against the Plaintiff in order to fabricate probable cause.

427. That in 2013, Defendant Kevin Petit provided the Rhode Island State Police Financial Crimes Unit with such false statements and evidence and urged them to prosecute the Plaintiff.

428. That Defendant Kevin Petit urged the prosecution of the Plaintiff knowing or having reason to know that such prosecution would commence based on false statements and false evidence.

429. That Defendant Kevin Petit urged the prosecution of the Plaintiff in retaliation of the Plaintiff filing a lawsuit against the Defendant and Defendants Steve Lussier, John Lussier, and Donald Lussier.

430. That in 2014, Defendant Kevin Petit urged the prosecution of the Plaintiff in order to retaliate against the Plaintiff for filing a lawsuit against the Defendant.

431. That Defendant Kevin Petit induced the prosecution of the Plaintiff knowing or having reason to know that such prosecution lacked probable cause.

432. That without the inducement of Defendant Kevin Petit, the prosecution of the Plaintiff would not have commenced.

433. That without the inducement and fabricated false evidence by Defendant Kevin Petit, the prosecution of the Plaintiff would not have commenced.

434. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

435. Defendant acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of his conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendant.

WHEREFORE, Plaintiff demands judgment against Defendant Kevin Petit as follows:
    (a) Compensatory Damages of $200,000.
    (b) Treble Punitive Damages of $600,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.

## Count 10 - Retaliatory Prosecution

Defendants: Steve Lussier, John Lussier, Donald Lussier and Kevin Petit.

436. Plaintiff incorporates the allegations in paragraphs 12 through 433 in this Complaint into this Tenth Cause of Action.

437. That Defendants Steve Lussier, John Lussier, Donald Lussier, and Kevin Petit did retaliate against the Plaintiff by causing the Plaintiff to be criminally charged in retaliation for the Plaintiff filing a civil law-suit against the Defendants.

438. That such investigation and prosecution by the Defendants was undertaken with substantial motivation of retaliating against the Plaintiff for protected speech.

439. That such investigatio and prosecution initiated by the Defendants was done in bad faith.

440. That the investigation and prosecution by the Defendants was produced by fraud, perjury, fabricated evidence, and other wrongful conduct undertaken in bad faith.

441. That the Defendants fabricated probable cause with false statements, misrepresentations, withheld evidence and fabricated evidence.

442. That Defendant Kevin Petit knowingly and intentionally presented false statements, false testimony, and false evidence in order to have the Plaintiff prosecuted.

443. That Defendant Kevin Petit knowingly and intentionally withheld evidence in order to fabricate probable cause to prosecute the Plaintiff.

444. That the Defendants knowingly and intentionally destroyed exculpatory evidence.

445. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

446. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier and Kevin Petit and each of them, jointly and severally as follows:
    (a) Compensatory Damages of $100,000.
    (b) Treble punitive damages of $300,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.


## COUNT 11 - Defamation and Libel

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police, Warwick Police Department.

447. Plaintiff incorporates the allegations in paragraphs 12 through 445 in this Complaint into this Eleventh Cause of Action.

448. That on July 30, 2013 Defendant Steve Lussier did provide a written statement that contained false and defamatory information about the Plaintiff to Defendant Kevin Petit.

449. That Defendant Kevin Petit republished the defamatory statement to Defendants James Brown, Nicholas Rivello, Rhode Island State Police and the Warwick Police Department.

450. That Defendants Kevin Petit republished the defamatory statement to the Rhode Island Attorney General's office.

451. That Defendants Kevin Petit, James Brown, and Nicholas Rivello republished the defamatory statement to the Rhode Island Attorney General and to the Kent County Superior Court.

452. That Defendants Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police and Warwick Police did republish the defamatory statement to the press, including the Providence Journal.

453. That the Providence Journal did republish the defamatory statement on or about June 11, 2014.

454. That on April 16, 2014 Defendant Steve Lussier did provide a written statement that contained false and defamatory statements about the Plaintiff to Defendants James Brown, Nicholas Rivello, and the Rhode Island State Police.

455. That Defendants James Brown, Nicholas Rivello and R.I. State Police did republish those statements to the R.I. Attorney General and the press, including the Providence Journal.

456. That such defamatory statements included accusing the Plaintiff of the crime of embezzlement.

457. That such statements were utterly false, as proven by the ATC Inc payroll reports, financial statements, and emails that the Defendants intentionally destroyed.

458. That such defamtory statements were designed to intentionally injure the Plaintiff by way of making it difficult to maintain employment in the accounting profession.

460. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

461. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their

conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police and Warwick Police Department, and each of them, jointly and severally as follows:
(a) Compensatory damages of $1,000,000.
(b) Treble punitive damages of $3,000,000.
(c) Pre-judgment and post-judgment interest as allowed by law.
(d) Any additoinal relief deemed just and proper by the Court.

## COUNT 12 - Libel Per Se.

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police, Warwick Police Department.

462. Plaintiff incorporates the allegations in paragraphs 12 through 461 of this Complaint into this Twelth Cause of Action.

463. As a direct and proximate result of the Defendants acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

464. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello, Rhode Island State Police, and Warwick Police Department, and each of them, jointly and severally, as follows:
(a) Compensatory damages of $1,000,000.
(b) Treble punitive damages of $3,000,000.
(c) Pre-judgment and post-judgment interest as allowed by law.
(d) Any additional relief deemed just and proper by the Court.

## COUNT 13 - Concealment of Evidence - 42 USCS §1983

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello

465. Plaintiff incorporates the allegations in paragraphs 12 through 463 in this Complaint into this Thirteenth Cause of Action.

466. That Defendants willfully and intentionally concealed material evidence from the Plaintiff.

467. That the Defendants willfully and intentionally concealed the emails that were contained in the Plaintiff's 'jboudreau@autotempcontrols.com' email

account.

468. That the Defendants willfully and intentionally concealed the payroll documents contained in the Plaintiff's 'jboudreau@autotempcontrols.com' email account.

469. That the Defendants willfully and intentionally concealed the bonus documents contained in the Plaintiff's 'jboudreau@autotempcontrols.com' email account.

470. That the defendants willfully and intentionally concealed the payroll reports of bonuses paid to other employees from October 2010 to June 2011.

471. That the Defendants willfully and intentionally concealed the payroll reports of other employees that received Christmas bonuses in 2010.

472. That the Defendants intentionally concealed job cost reports for 2009-11 that bonus payments were based on.

473. That the Defendants intentionally concealed general ledger reports that would depict, in detail, the cost savings of the company from 2009 to 2011.

474. That the Defendants intentionally concealed the monthly financial statements from 2010 to 2011 that would depict the profitability of the company.

475. That the Defendants willfully and intentionally concealed such evidence in order to fabricate probable cause

476. That Defendants intentionally concealed such evidence in an effort to deny the Plaintiff the right to a fair trial.

477. That Defendants intentionally concealed such evidence in an effort to deny the Plaintiff of due process.

478. That Defendants intentionally concealed such evidence in an effort to deny the Plaintiff of his civil rights.

479. As a direct and proximate result of the Defendants acts, the Plaintiff sustained injury, mental anguish, emotional distress, humilation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

480. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, and Nicholas Rivello, and each of them, jointly and severally, as follows:
    (a) Compensatory damages of $100,000
    (b) Treble punitive damages of $300,000
    (c) Pre-judgment and post-judgment interest as allowed by law.

(d) Any additional relief deemed just and proper by the Court.

COUNT 14 - False Report of a Crime (R.I.G.L. §11-32-2)

Defendants: Steve Lussier

481. Plaintiff incorporates the allegations in paragraphs 12 through 480 of this Complaint into this Fourteenth Cause of Action

482. That on July 30, 2013 Defendant Steve Lussier willfully and intentionally filed a false police report with Defendant Kevin Petit.

483. That such report contained allegations of embezzlement of payroll bonuses that was utterly false.

484. That such report contained false statements that contradicted the ATC Inc payroll reports, financial statements, and emails and documents  in the Plaintiff's 'jboudreau@autotempcontrols.com' email account.

485. That Defendant Steve Lussier filed such false police report in retaliation for the Plaintiff filing a lawsuit against the Defendant.

WHEREFORE, Plaintiff demands judgment against Defendant Steve Lussier as follows
    (a) Declaratory Relief
    (b) Any additional relief deemed just and proper by the Court.


COUNT 15 - False Statements & Omissions in Warrant Affidavits 42 USC §1983

Defendants: James Brown

486. Plaintiff incorporates the allegations in paragraphs 12 through 485 of this Complaint into this fifthteenth Cause of Action

487. Defendant James Brown did include false statements knowingly or with reckless disregard for the truth in his warrant affidavits.

488. These false statements were to mislead the magistrate and obtain search warrants for the Plaintiff's banking records, and obtain arrest warrants, depriving the Plaintiff of his right to be free of unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the Constitution of the United States.

489. Defendant James Brown did omit material facts from his warrant affidavits knowingly or with reckless disregard for the truth, in order to mislead the magistrate to obtain search warrants and arrest warrants, depriving the Plaintiff of his protected rights guaranteed by the Constitition of the United States.

490. As a direct and proximate result of the Defendant's acts, the Plaintiff sustained injury, mental anguuish, emotional distress, humiliation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss and financial hardship.

491. Defendant acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendant James Brown as follows:
    (a) Compensatory Damages of $100,000.
    (b) Treble punitive damages of $300,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.


## COUNT 16 - Invasion of Privacy (R.I.G.L. §9-1-28.1)

Defendants: James Brown, Rhode Island State Police

492. Plaintiff incorporates the allegations in paragraphs 12 through 489 of this Complaint into this Sixteenth Cause of Action.

493. Defendant James Brown invaded the Plaintiff's privacy by gaining access to Plaintiff's banking records by use of warrants obtained with false, omitted, and misleading information.

494. Defendant gave unreasonable publicity to the Plaintiff's private life by sharing those bank records with third parties.

495. Defendant gave unreasonable publicity to the Plaintiff's private life by making such records part of the public record.

496. That the Plaintiff had a reasonable expectation of privacy in his banking activities.

497. As a direct and proximate result of the Defendant's acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

498. Defendant acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendant James Brown as follows:
    (a) Compensatory damages of $50,000.
    (b) Treble punitive damages of $150,000.
    (c) Pre-judgment and post-judgment interest as allowed by law.
    (d) Any additional relief deemed just and proper by the Court.


## COUNT 17 - Failure to Intervene/Neglect to Prevent Harm From Conspiracy

Defendants: James Brown, Nicholas Rivello

499. Plaintiff incorporates the allegations in paragraphs 12 through 496 of this Complaint into this Seventeenth Cause of Action.

500. Defendants, and each of them, had knowledge that one or more of the wrongs conspired to be done, and described throughout this Complaint, were about to be, or were in the process of being committed.

501. Said Defendants had the power to prevent or aid in preventing the commission of said wrongs.

502. Said wrongful acts were committed, and defendants could have prevented said acts.

503. The failure to prevent the aforementioned violations of the Plaintiff's civil rights were done in contravention to 42 USCS §1983, 1986.

504. As a direct and proximate result of the Defendants acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrasment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

WHEREFORE, Plaintiff demands judgment against Defendants James Brown and Nicholas Rivello as follows:
(a) Compensatory damages of $50,000.
(b) Any additional relief deemed just and proper by the Court.


COUNT 18 - Negligent Infliction of Emotional Distress

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, Nicholas Rivello.

505. Plaintiff incorporates the allegations in paragraphs 12 through 503 of this Complaint into this Eighteenth Cause of Action.

506. That Defendants Kevin Petit, James Brown, and Nicholas Rivello were negligent in performing their official duties and utilizing unlawful tactics and other unlawful acts against the Plaintiff, and were further negligent in their failure to foresee that such unlawful acts would cause Plaintiff mental anguish, humiliation, embarrasment, and emotional distress

507. As a direct and proximate result of said acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarrasment, and loss of reputation and standing.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, and Nicholas Rivello as follows:
(a) Compensatory damages of $100,000.
(b) Any additional relief deemed just and proper by the Court.


COUNT 19 - Intentional Infliction of Emotional Distress

Defendants: Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, and Nicholas Rivello

508. Plaintiff incorporates the allegations in paragraphs 12 through 506 in this Complaint into this Nineteenth Cause of Action.

509. Defendants, by their intentional and outrageous conduct, intended to embarass, humiliate, intimidate, and to mentally and emotionally disturb the Plaintiff, and actively desired to bring about the Plaintiff's mental anguish, or should have realized to a virtual certainty that by their acts that such intentional and outrageous conduct would cause the Plaintiff to suffer mental anguish, humilation, embarassment, and emotional distress.

510. As a direct and proximate result of the Defendants acts, the Plaintiff sustained injury, mental anguish, emotional distress, humiliation, embarassment, loss of business opportunities, loss of reputation and standing, loss of earning capacity, false light, financial loss, and financial hardship.

511. Defendants acted maliciously, willfully, intentionally, oppressively, unlawfully, and in reckless disregard of the possible results of their conduct, and Plaintiff is therefore entitled to punitive and exemplary damages for the sake of example and by way of punishing defendants.

WHEREFORE, Plaintiff demands judgment against Defendants Steve Lussier, John Lussier, Donald Lussier, Kevin Petit, James Brown, and Nicholas Rivello as follows, jointly and severally,
    (a) Compensatory Damages of $250,000.
    (b) Punitive damages of $750,000.
    (c) Any additional relief deemed just and proper by the Court.

## COUNT 20 - Negligent Employment/Retention/Failure to Discipline

Defendants: Rhode Island State Police, Warwick Police Department, City of Warwick.

512. Plaintiff incorporates the allegations in paragraphs 12 through 509 in this Complaint into this Twentieth Cause of Action.

513. On or about July 30, 2013, and for some time prior thereto, Defendants Warwick Police Department, City of Warwick, and Rhode Island State Police were charged with the selection, assignment, training, discipline, and discharge of police officers of the Warwick Police and Rhode Island State police. At all times material herein, Defendants had the power and authority to discharge or re-assign police officers who were believed to exhibit tendencies, traits of character, propensities, behavior, conduct or attitudes which rendered such persons unfit or undesirable for the position of police officer, or alternatively, for assignment into law enforcement duties and functions.

514. That on or about July 30, 2013, and for some time prior thereto, Defendants knew or should have known, that Defendant Kevin Petit was prone to violate the civil rights of citizens

515. That on or about July 30, 2013 to May 1, 2017 Defendants failed to investigate the Plaintiff's complaint and failed to discipline Defendant

Kevin Petit for the allegations contained herein.

514. Notwithstanding the aforedescribed knowledge, acts, and omissions of Defendants, said Defendants negligently and carelessly employed Defendant Kevin Petit and permitted him to be assigned to law enforcement duties that brought him into contact with members of the public.

515. The aforedescribed acts and omissions by Defendants are in violation of the Constitution of the United States and in contravention of 42 USC §1983.

WHERFORE, Plaintiff demands judgmnet against Defendants City of Warick, Warwick Police Department, and Rhode Island State Police, and each of them, jointly and severally, as follows:
    (a) Compensatory Damages of $100,000.
    (b) Any additional relief deemed just and proper by the Court.


## COUNT 21 - Policy, Custom and/or Practice of Failing to Properly Train and Supervise Law Enforcement Employees

Defendants: City of Warwick, Warwick Police Department, Rhode Island State Police.

516. Plaintiff incorporates the allegations in paragraphs 12 through 514 of this Complaint into this Twenty-First Court of Action.

517. On or about June 11,2014, and for some time prior thereto, it was,and remains, the police, custom, and/or practice of the Defendants to allow its officers to violate the civil rights of citizens, and to fail to make adequate investigation of citizen complains against employees in the capacity of police officers, detectives, or supervisorial officials; to fail to discipline, reprimand, punish, correct, re-assign or dismiss officers, detectives, or supervisorial officials who violate citizens civil rights.

518. Defendants are liable under 42 USCS §1983 for failing to supervise and train its police officers and for overlooking and covering up police misconduct. The Defendants had a general policy, pattern, and/or practice of not discipling police officers for their conduct, thereby sanctioning the police officer's acctions, which amounted to a departmental policy of overlooking constitutional violations. The Defendants failure to supervise and train its police officers, and the Defendants willful blindness towards the constitutional violations of its employees, constitutes gross negligence and/or deliberate and conscious indifference to the Plaintiff's civil rights.

519. That the Defendants formal and informal actions in overlooking, hiding, and/or tacitly encouraging police misconduct, reflect a policy, practice, custom and procedure authorizing and allowing such conduct that violated the Plaintiff's civil rights.

WHEREFORE, Plaintiff demands judgment against Defendants City of Warwick, Warwick Police Department, and Rhode Island State Police, and each of them, jointly and severally as follows:
   (a) Compensatory damages of $100,000.
   (b) Any additional relief deemed just and proper by the Court.


WHEREFORE, Plaintiff demands the following relief, jointly and severally, against all defendants.

First Cause of Action

(a) Compensatory damages of $1,500,000.
(b) Punitive damages of $4,500,000.

Second Cause of Action
(a) Compensatory damages of $100,000.
(b) Punitive damages of $300,000.

Third Cause of Action
(a) Compensatory damages of $100,000.
(b) Punitive damages of $300,000.

Fourth Cause of Action
(a) Compensatory Damages of $100,000.
(b)Punitive damages of $300,000.

Fifth Cause of Action:
(a) Compensatory Damages of $100,000
(b) Punitive damages of $300,000.

Sixth Cause of Action
(a) Compensatory damages of $100,000.
(b) Punitive damages of $300,000.

Seventh Cause of Action:
(a) Compensatory damages of $100,000.
(b) Punitive damages of $300,000.

Eighth Cause of Action:
(a) Compensatory Damages of $100,000.
(b) Punitive Damages of $300,000.

Nineth Cause of Action:
(a) Compensatory Damages of $200,000.
(b) Punitive Damages of $600,000.

Tenth Cause of Action:
(a) Compensatory Damages of $100,000
(b) Punitive Damages of $300,000.

Eleventh Cause of Action:
(a) Compensatory Damages of $1,000,000.
(b) Punitive Damages of $3,000,000.

Twelth Cause of Action:
(a) Compensatory Damages of $1,000,000.
(b) Punitive Damages of $3,000,000.

Thirteenth Cause of Action:
(a) Compensatory Damages of $100,000.
(b) Punitive damages of $300,000.

Fourteenth Cause of Action:
(a) Declatory Relief

Fifthteenth Cause of Action:
(a) Compensatory damages of $100,000.
(b) Punitive damages of $300,000.

Sixteenth Cause of Action:
(a) Compensatory Damages of $50,000.
(b) Punitive damages of $150,000.

Seventeenth Cause of Action:
(a) Compensatory Damages of $50,000.

Eighteenth Cause of Action:
(a) Compensatory damages of $100,000

Nineteenth Cause of Action:
(a) Compensatory Damages of $250,000.
(b) Punitive Damages of $750,000.

Twentieth Cause of Action:
(a) Compensatory damages of $100,000.

Twenty-First Cause of Action:
(a) Compensatory Damages of $100,000.


    Plaintiff further prays for pre-judgmnet interest. Defendants have had custody and control of the monies rightfully due and owing to Plaintiff since the day of the incidents made the basis of this lawsuit. As a result of said custody and control, Defendants have benefitted by virtue of interest earned on said monies. Therefore, in order to avoid unjust enrichment of the Defendants, Plaintiff prays that the Court aware pre-judgment interest as allows

48

allowed by law.

<u>JURY TRIAL IS HEREBY DEMANDED</u>

Respectfully Submitted,

Jason Boudreau
#10950070
Donald W. Wyatt Detention Facility
950 High Street
Central Falls, RI 02863

EXHIBIT 1

# Automatic Temperature Controls, Inc.

*d/b/a* CHAC

95 Connecticut Street, Cranston, RI 02920
Phone: (401) 946-5780   Fax: (401) 946-5795
E-mail: slussier@autotempcontrols.com
AN EQUAL OPPORTUNITY EMPLOYER
KMDIGITAL AIC

August 29, 2009

SUBJECT:  BASE SALARY AND BONUS COMPENSATION PACKAGE FOR
AUTOMATIC TEMPERATURE CONTROLS INC. FINANCIAL MANAGER POSITION

Base salary and bonus compensation will be based upon the following:

| BASE SALARY < 5% OER | SALARY & BONUS 5% YTD OER | SALARY & BONUS 6% YTD OER | SALARY & BONUS 7% YTD OER | SALARY & BONUS 8% YTD OER | SALARY & BONUS 9% YTD OER | SALARY & BONUS 10% YTD OER |
|---|---|---|---|---|---|---|
| $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 | $ 55,000.00 |
| $ 0 | $ 11,000.00 | $ 12,100.00 | $ 13,200.00 | $ 14,300.00 | $ 15,400.00 | $ 16,500.00 |
| $ 55,000.00 | $ 66,000.00 | $ 67,100.00 | $ 68,200.00 | $ 69,300.00 | $ 70,400.00 | $ 71,500.00 |

- BONUS IS PAID AFTER A YEAR OF SERVICE OPERATING EXPENSE
  REDUCTION (OER)  IS CALCULATED FROM YEAR TO DATE OF START OF
  EMPLOYMENT

- MEDICAL AND RETIREMENT BENEFITS ARE IN ADDITION TO THE
  COMPENSATION PACKAGE

- OPERATING EXPENSE INCLUDES ALL EXPENSES

/0

### *Job Description Template*

**Incumbent** _____

1. **Job Title** *(marketplace descriptor if applicable)* **Finance Manager ATC**

2. **Basic function** *(why the job exists)*
   Manages the finance department and is accountable for the operation and outputs. Provides & maintains up to date financial measurement systems, including detail profit & loss monthly statement by function. Proactively deals with the accountant providing on time accurate information with in 30 days of year end. Books are closed monthly, provides monthly cash flow analysis taking advantage of appropriate discounts. Manages; payables, receivables, weekly payroll and all insurance programs. Provides the metrics & systems to accurately measure performance within the company.

3. **Reporting relationships** *(up, down & sideways)*
   Direct report to the President, peers include Operations Manager, Project Managers and Service Manager. Reports; Office Manager & Administrative Coordinator.

4. **Authority** *(defined; "power to take action or make a decision")*
   $ 20 thousand dollars purchasing authority, takes advantage of appropriate discounts and payables within agreed to parameters. Hire & fire direct reports, chooses accountant and insurance carriers. Develops and maintains all financial systems, accounting software and records.

5. **Responsibility / accountability** *(defined; "charged to make what things happen", may delegate responsibility while always maintaining accountability, if responsibility is shared accountability cannot be!)*
   Accountable for all payables, receivables, cash flow, banking relationships, interfaces with accountant, federal & internal payroll, adequate insurance programs at competitive cost, accounting and other measurement systems.

6. **Principle duties** *(a. what incumbents must do: often repeatable activities)*
   Daily; bank deposits, payables, receivables. Weekly; cash flow analysis, payroll(federal / internal). Monthly; profit & loss statement, closing of books. Annual; year end P&L, balance sheet and rotating insurance program evaluations & recommendations.
   **(b.** what incumbents must **display**: attitude, capabilities & capacity)
   Strong leadership & management skills behaviors, a balanced approach to finance problems delivering reasonable, timely solutions. A confident approach with a professional demeanor, a continuous learning attitude with ability to multi-task in chaotic environment, creating financial processes that work and are easily understood.. Skills include; Excel, M/S project, Outlook & all other basic Microsoft suite programs, willing to learn & demonstrate proficiency in the accounting software American Contractor.

*/|*

**Finance Manager ATC**

7. **Standards & measurement** *(defined success criteria: actual #'s & outcomes)*
   Reduce overall expenses by 5% annually. Books closed; daily, weekly, monthly
   and yearly as described above. Reduce accounts receivables to 35 - 40 days.
   Determine the best insurance programs available for ATC providing 3 quotes per
   year for major insurance programs on a rotating basis. Set an improvement
   standard for discounts based on current analysis..

EXHIBIT 2

# Automatic Temperature Controls, Inc.

### DBA CHAC

95 Connecticut Street, Cranston, RI 02920
Phone: (401) 946-5780   Fax: (401) 946-5795
E-mail: slussier@autotempcontrols.com
AN EQUAL OPPORTUNITY EMPLOYER
KMDIGITAL AIC

July 11, 2011

Ms. Helen G. Gage
Chief, Labor Standards Examiner
Labor Standard Unit
Department of Labor and Training
1511 Pontiac Avenue
Cranston, RI 02920

RE: Jason Boudreau Complaint #2011-301

Dear Ms. Gage,

We have received your letter of complaint regarding Mr. Boudreau. Mr. Boudreau was terminated due to our investigation into his personal use of company computers.

We found images of illegal pornography on his desktop computer and called the State Police. The police have taken both our laptop computer and the desktop computer to be searched. He is also in the possession of an EVO Galaxy tablet computer which I assume is also in the possession of the State Police. For information on this matter please contact Det. Kevin Pettit 401- 255-5592

In our company handbook we have printed that upon separation from our company all property in the employee's possession must be returned to the company. We also under the "Pay at Time of Separation from Employment" will account for any outstanding debt owed to the company or any items not returned to the company. A final pay check for the time worked (less deductions) will be issued to the employee. Our accounting is not complete, but since the actions of Mr. Boudreau caused all of the items listed above to be confiscated by the State Police we feel he is at the very least liable for these items. Attached is our company handbook these clauses can be found on Page 22 and 23.

Secondly, the fact is and our payroll records will show that Mr. Boudreau has been paid for much more than his salary for this entire year therefore he is entitled to nothing. Mr. Boudreau was hired at the rate of $1,057.00 per week in 2009. He was given a raise by me in January 2010 to $1,250.00 per week. At the time of his dismissal he was making $1,400.00 per week as a result of unauthorized raises given to him, by him as he was in charge of the office payroll. Mr. Boudreau was also entitled to a bonus based upon a

percentage of expenses saved over the previous fiscal year. This bonus was to be calculated at <u>year end</u> ur fiscal year end in June 30th. Mr. Boudreau was paid his bonus in it's entirety for cost savings during the FY 2009 – 2010. These payments were spread out over 3 months and ended October 1 of 2010. Since then Mr. Boudreau has been paid in unwarranted bonuses by his own hand the sum of $35,604.00. Wages paid to Mr. Boudreau at the time of his termination from Automatic Temperature Controls Inc. from January 1 of 2011 were $70,141.00. By his own admission he claims he is owed $1,400.00 for his last week of pay, at the time he was terminated there were approximately 25 pay periods his compensation should have totaled $35,000.00. Attached is the payroll journal page showing his wages at week 25.

Finally, we also dispute the 2 weeks of vacation pay owed to Mr. Boudreau. Our handbook states that after 1 year of service you will receive one week of vacation, this week will be credited to the employee on the anniversary of the employee's date of hire. Mr. Boudreau was credited the one week at that time, he has not used the vacation time. Mr. Boudreau's second date of hire anniversary is in September of this year therefore he didn't warrant the second week of vacation. This policy is on page 16 of the attached employee handbook.

We also have not responded to Mr. Boudreau directly at the request of the State Police as the his investigation is currently on-going. He has threatened to call State and Federal Agencies about discrepancies in areas of the business that he was responsible for. As we find any discrepancies we will report them to the appropriate agencies. Again we feel it is in your best interest to contact Detective Petit prior to speaking with Mr. Boudreau about our response.

I will be happy to meet with you at your office or here at our home office. We feel that we are correct in not paying this dishonest and desperate employee.

Best Regards,

Steven P. Lussier
President
Automatic Temperature Controls Inc.

Exhibit 3

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

### Department of Labor and Training

Center General Complex
1511 Pontiac Avenue
Cranston, RI 02920-4407

Telephone:   (401) 462-8000
TTY:           Via RI Relay 711

Lincoln D. Chafee
Governor
Charles J. Fogarty
Director

July 20, 2011

Mr. Jason Boudreau
515 Camp Dixie Road
Pascoag, RI 02859

Re: Automatic Temperature Controls, Inc.
      Complaint # 2011-301

Dear Mr. Boudreau:

As a result of an investigation conducted by the Labor Standards Unit of the Rhode Island Department of Labor & Training, enclosed is a check for $2,096.21, payable to you.

This check represents a total of $2,800.00 in gross wages, minus deductions owed to you by your previous employer, Automatic Temperature Controls, Inc. and collected on your behalf in accordance with the provisions of the Labor Laws of the State of Rhode Island.

Please direct any further questions you may have in this regard to Helen Gage, Chief, Labor Standards Examiner at (401) 462-8550.

Very truly yours,

*Helen G. Gage*

Helen G. Gage
Chief, Labor Standards Examiner
Labor Standards Unit

HG/am

*Jason – Please send me a note that you are withdrawing your claim.*
*Thank you,*
*Helen*
*462-8545*

*An Equal Opportunity Employer/Program. / Auxiliary aids and services are available upon request to individuals with disabilities.*
*TTY via RI Relay 711*

# EXHIBIT

# 74

EXHIBIT

1

DLT-BR-20-A (Rev. 11/05)



Thomas J. Daniels Chairman

Nathaniel J. Rendine

Edward A. Lombardo Sr.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

# Board of Review

74 West Road, Hazard Building, First Floor, Cranston, RI 02920

Telephone (401) 462-9400 Fax (401) 462-9401

## In the Matter of:

| | |
|---|---|
| Name:    Jason Boudreau | Time and Place of Hearing: |
| Address:    515 Camp Dixie Rd. | Cranston, Rhode Island |
|         Pascoag, RI 02859 | January 24, 2012 |
| S.S. Number:    6558 | Reporter: Jaimie Calouro |
| Appeal Number: 20116093 | Referee: Gunter A. Vukic |

## A P P E A R A N C E S

| | |
|---|---|
| Jason Boudreau | Claimant |
| Matthew J. Brier | Claimant Counsel |
| Steven Lussier | Employer Representative |
| Robert Gillheeney | Employer Representative |

CAPITOL COURT REPORTING, INC. (401) 739-3600

# EXHIBIT

# 12

EXHIBIT ⑩

11

        document that they said they don't have.  So I, I just

        will not go into that.  That's for the next level if,

        in fact, it's necessary.  I do appreciate what you're

        saying, you'll be able to solicit whatever testimony

        you would like to regarding the, um, process without

        really getting into who sent what when.

ATT:      Okay.

REF:      Sure that's probably not real clear to you gentleman

        but counsel is familiar with what we're talking about.

        And with that I will, um, do you have a desire to have

        either of, Mister, strike that, Mr. Gillheeney

        sequestered sir?

ATT:      Um, I don't, I don't, um, that means to have him sit

        outside.

CLT:      No, that's fine.

ATT:      No I don't, I don't think so.

REF:      All right.

ATT:      We'll be fine.

REF:      Al right.  I'm not even sure he'll have testimony to

        offer.  Again folks, stay with first hand testimony.

        All right. Mr., um, Lussier, why is Mr. Boudreau not

        working for you any longer?

EMP1:    Mr. Boudreau had child pornography on his computer.

        The, um, police actually arrested him at Automatic

EXHIBIT

12

Temperature Controls, 95 Connecticut Street for a charge of actually not having a, um, valid license, suspended license. Um, during that time the detective advised me to get Mr. Boudreau out of the office so he could search his computer or take his computer. That computer is still in the custody of the state police (inaudible).

REF:        The arrest was for a motor vehicle issue.

EMP1:       A motor vehicle issue. That's, that's how they were able to detain Mr. Boudreau. Later on he was arrested for child pornography.

REF:        All right. So he was, and, and again --

EMP1:       Based upon the findings on that computer.

REF:        All right.

EMP1:       Do you want the, um, the case documents?

REF:        I'm not sure just yet. And again, I appreciate what you're saying but let's, let's try to take it one step at a time. And on June 24, and folks, I know it's tough to go back that far. Sir? It's your attorney. If you'd like to whisper sweet nothings in his ear you can do that. But I don't think he'll appreciate it. He's paying attention –

ATT:        And my wife wouldn't either.


CAPITOL COURT REPORTING, INC. (401) 739-3600

EXHIBIT ⊛

13

REF:       All right.  Well, he's paying attention to

           representing you well, so please don't say anything –

CLT:       No.

REF:       Unless he tells you to or I ask you to and he doesn't

           object.  All right.  See I'm an old guy, I forget

           where I was.  June 24.  (Inaudible).  So at that point

           Mr. Boudreau's at work.  Were you aware that the

           police were coming in?

EMP1:      Yes we were aware of the police that were coming in,

           um, from the day, two days before on the twenty-

           second.  We had actually gone to the Warwick, um,

           Police Department with what we had found on the

           computer, um, three days before.

REF:       All right.  Well that's, so let's start three days

           before his last day of work.  I'm under the impression

           this all starts because of a traffic, traffic

           violation.

EMP1:      No.  Um, if you want to, do you want the full story?

REF:       Yes, give me the full story.

EMP1:      How he got discharged, okay.  Um, during, um, prior

           week, um, two to three weeks before our, um, computer

           people, Mr. Boudreau's computer crashed and, um, to

           recover it, they tried to recover the data off of his

CAPITOL COURT REPORTING, INC. (401) 739-3600

EXHIBIT

hard drive.  During that, um, recovery they found

pornography on the computer.

ATT:       Could I just have a continuing objection on the

hearsay.

EMP1:      That's not hearsay.

REF:       No.  Sir.  I know you don't have an attorney and Mr.

Gillheeney's sitting there nice and quiet.  Let me try

to take care of that.  Otherwise it'll get even more

confused.  I can confuse it pretty much all by myself

But I'm going to hope I don't do that.  It's hearsay,

sir, because you're telling me something somebody else

told somebody, who somebody may have told --

EMP1:      Understood.

REF:       That's hearsay.

EMP1:      Understood.

REF:       All right.  So what we have is a crashed computer.

Some IT people come in.  Are they your employees or?

EMP1:      Yes they are.

REF:       All right.  So you have an IT employee trying to

recover data from the hard drive and pick it up from

there.  Is this one IT --

EMP1:      (Inaudible).

REF:       Two IT --

EXHIBIT

REF:       Finish your thought sir.  I listen to hearsay, I don't

           necessarily give it the same weight as sworn testimony

           but I listen to hearsay.

EMP1:      If, if I that could be a violation of our sexual

           harassment policy if our IT people are, are picking

           this stuff up on the recovery of his hard drive and

           seeing this stuff.

ATT:       That's a bit of a stretch.

REF:       Continue.

EMP1:      Gross insubordination. Willful --

ATT:       You just --

REF:       Sir, all due respect, because the transcriptionists

           sometimes have to type these things, stuff that

           doesn't apply --

EMP1:      Okay.

REF:       Frankly --

EMP1:      That's, I'm, I'm done with that, sir.  I'm done with

           the, um, what's in the handbook.

REF:       So there's not a, um, a restriction from personal use

           as you read that.

EMP1:      Right.  No, there's misuse.

REF:       Yes.  When you discovered prior, well let's go back to

           this first part, at what point did Mr. Boudreau get

           discharged?

CAPITOL COURT REPORTING, INC. (401) 739-3600

EXHIBIT

EMP1:     He got discharged that day.  I was on my way to

          Chicago he called me that night.  I told him he no

          longer (inaudible).

REF:      So this is the post arrest.

EMP1:     Yes, after he was arrested.

REF:      What did you tell him was the reason or his discharge?

EMP1:     Um, I just told him that he no longer worked for the

          company.  I would imagine that he knew why.

REF:      All right.  All due respect, sir.  I, I can't imagine

          anything.

EMP1:     Okay.  I understand.

REF:      And I'm grateful for that.

EMP1:     I don't remember the conversation because I was, it

          was on the cell phone.  I was very, very, um, I guess,

          I would say worked up so I don't remember --

REF:      All right. So you told him he doesn't work for the

          company anymore.

EMP1:     Yes.  And he also drove our vehicles with a suspended

          license.  Mr. Gillheeney's here to attest to that.

          That's what he's here for.

REF:      Go back to, um, the computer.  So you had images and

          e-mails that you took to the, which police department?

EMP1:     The Warwick Police Department.

EXHIBIT ⊕

28

his vacation time, which I responded yes, I do
remember that.

REF:      All right.  Anything else I should know about the
discharge?

EMP1:     Um --

REF:      Leading up to the discharge, to the discharge, nothing
post discharge.

EMP1:     That's it.

REF:      Thank you.  Counsel.

ATT:      Now prior to this he had no verbal or written
warnings?

EMP1:     No he did not.

ATT:      Okay.  But you, you made some side, snide comment about
how he was on his way to being fired anyways.

EMP1:     Yes.  Um, the week before, and we, Mr. Boudreau
overdrew our checkbook, being the controller that he
is --

ATT:      Yup.

EMP1:     And we received a notice from the bank saying that
your checkbook is overdrawn.  I think, as the duties
of a controller, you shouldn't bounce checks.

ATT:      Okay.  But maybe he made a mistake.

EMP1:     Okay.

ATT:      Did you ever approach him and confront him about that?

EXHIBIT

29

EMP1:      No because I was in the middle of --

ATT:       So you didn't, so you didn't, so that wasn't part of

           the reason for, for firing --

EMP1:      No not at that time, no.

ATT:       Okay. So you're just throwing that, piling that on.

EMP1:      It would, it would have happened.

ATT:       Okay.  But did that, was that a, was that a factor in

           your decision to let him go?

EMP1:      No the child pornography was the only.

ATT:       Okay.  Now let's talk about the computer.  Let me ask

           you this, you don't have a copy of the police report.

EMP1:      No I don't.

ATT:       Okay.  And you received a copy of the, the Notice of

           Referee Hearing.

EMP1:      Yes.

ATT:       Okay.  And on the back it asks you to bring any

           statements, papers, affidavits or any other physical

           evidence important to the case.

EMP1:      Yes.

ATT:       Okay.  But you didn't bring anything, you didn't bring

           any evidence, you didn't bring any police report here

           today.

EMP1:      No I didn't bring the police report, I brought the

           arrest report.

CAPITOL COURT REPORTING, INC. (401) 739-3600

EXHIBIT@

37

technology, I, I'm, I'd still know from experience

here, those reports come in and they show user,

location, see then they start showing time, site, all

those things, IP addresses, all that stuff is on most

of that tracking software.  It, it's not hard to

figure that counsel is making the case that since the

computer is on all night, maybe the mices [sic] went

in and were doing it and you're charging this poor

gentleman.  Well I don't have any of that.

ATT:      Did you, are you aware that supposedly the pictures

          were on a flash drive?

EMP1:     They were on a flash drive.  The reason why the

          tracing software picked that up was when he inserted

          the flash drive into the computer the images --

ATT:      Okay.  Whoever put the flash drive into the computer

          you're saying.  But you never saw him put the flash

          drive into the computer.

EMP1:     No.

REF:      Good?

ATT:      Okay, thank you.  I'm all set.

REF:      Mr. Gillheeney, well first before we go to you, let me

          come back to you for a minute Mr. Lussier.

REF:      When did you find out Mr. Boudreau was on a suspended

          license?

CAPITOL COURT REPORTING, INC. (401) 739-3600

EXHIBIT⊛

38

EMP1:     Um, the day he was arrested for the suspended license.

REF:      Did you talk to Mr. Boudreau about the suspended

          license, for instance, when why, did you know any of

          that stuff?

EMP1:     No, no I didn't.

REF:      After you found out he had a suspended license did he

          drive any company vehicle?

EMP1:     No.

REF:      Move to Mr. Gillheeney.  All right. If, did you have

          any questions on that Mr. Brier -

ATT:      Um -

REF:      For Mr. Lussier.

ATT:      I mean is it fair to say that the, the primary reason

          you fired him was because of this allegation of the

          pornography?

EMP1:     Yes.

REF:      I'm looking at that from the (inaudible) perspective

          because he made a comment about it earlier.  So,

          apparently that wasn't known.  What do you have to

          tell me Mr. Gillheeney other than --

EMP2:     Um, we have, um, a lot of trucks that need maintenance

          and when I went to pick them up Jay would go with me

          and he'd drive them back.

REF:      Do you know if his license was suspended at the time?

EXHIBIT⊗

EMP2:       No I didn't.

REF:        All right, thank you.  Anything else for Mr.

            Gillheeney?

ATT:        No, I'm all set.

REF:        Thank you.  Counsel?

ATT:        Yeah, thank you.  Um, Mr. Boudreau, just briefly,

            what, you were the controller?

CLT:        Yes.

ATT:        So what, what exactly did you do?

CLT:        Um, the main part of the job was, um, it's the

            overseeing (inaudible) the accounting, um, cash flow,

            um, helping Mr. Lussier with operations.  Um,

            typically (inaudible) helping him get the paperwork

            together for to be here.  Um, doing the unemployment

            paperwork, which wasn't filed apparently.  Um, that

            all (inaudible).

ATT:        Now what exactly, what kind of company is this?

CLT:        It's an HVAC contractor.

ATT:        Okay.  And you were there two years?

CLT:        - Correct.

ATT:        Full time fourteen hundred dollars a week?

CLT:        Correct.

ATT:        And you didn't have any prior warnings or anything?

CLT:        No.

EXHIBIT ⊛

40

ATT:      Okay.  So you hear the, the allegations about the, the
          pornography on your, on your computer.

CLT:      Um-hum.

ATT:      Okay.  What, what do you know about all of this?

CLT:      What I know about it is from the police report that
          I've seen, um, which starts off as a narrative
          regarding John Lussier supposedly had witnessed --

ATT:      Who, who's John Lussier?

CLT:      Steven's brother.

ATT:      Okay.  And what part of the company, what does he do
          for the company?

CLT:      (Inaudible).

ATT:      Huh?

CLT:      Um, he was a project manager.

ATT:      Okay.  Go on.

CLT:      Um, the statements, um, that the police had said the
          he witnessed a, um, image being viewed on my computer,
          um --

ATT:      And when was that?

CLT:      Um, the statement, um, from the police says early
          June.

ATT:      Okay.

CLT:      This is what's in the police report that was filed on
          the twentieth.

CAPITOL COURT REPORTING, INC. (401) 739-3600

Exhibit 4

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
### for the

Jason Boudreau
*Plaintiff*
v.
Steve Lussier, et al.
*Defendant*

)
)
)
)
)
)

Civil Action No.  13-388 S

## WAIVER OF THE SERVICE OF SUMMONS

To:  Jason Boudreau, Pro-se
*(Name of the plaintiff's attorney or unrepresented plaintiff)*

I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from _____7/16/13_____, the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name of party waiving service of summons*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

### Duty to Avoid Unnecessary Expenses of Serving a Summons

Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

"Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

AO 398 (Rev. 01/09) Notice of a Lawsuit and Request to Waive Service of a Summons

# UNITED STATES DISTRICT COURT

### for the
### District of Rhode Island

| | | |
|---|---|---|
| Jason Boudreau | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. |
| Steve Lussier, et al. | ) | 13-388 S |
| Defendant | ) | |

### NOTICE OF A LAWSUIT AND REQUEST TO WAIVE SERVICE OF A SUMMONS

To: _____ **Steve Lussier** _____

(Name of the defendant or - if the defendant is a corporation, partnership, or association - an officer or agent authorized to receive service)

**Why are you getting this?**

A lawsuit has been filed against you, or the entity you represent, in this court under the number shown above. A copy of the complaint is attached.

This is not a summons, or an official notice from the court. It is a request that, to avoid expenses, you waive formal service of a summons by signing and returning the enclosed waiver. To avoid these expenses, you must return the signed waiver within _____ days (give at least 30 days, or at least 60 days if the defendant is outside any judicial district of the United States) from the date shown below, which is the date this notice was sent. Two copies of the waiver form are enclosed, along with a stamped, self-addressed envelope or other prepaid means for returning one copy. You may keep the other copy.

**What happens next?**

If you return the signed waiver, I will file it with the court. The action will then proceed as if you had been served on the date the waiver is filed, but no summons will be served on you and you will have 60 days from the date this notice is sent (see the date below) to answer the complaint (or 90 days if this notice is sent to you outside any judicial district of the United States).

If you do not return the signed waiver within the time indicated, I will arrange to have the summons and complaint served on you. And I will ask the court to require you, or the entity you represent, to pay the expenses of making service.

Please read the enclosed statement about the duty to avoid unnecessary expenses.

I certify that this request is being sent to you on the date below.

Date: ___7/16/13_____

_____
Signature of the attorney or unrepresented party

Jason Boudreau, Pro-se
_____
Printed name

90 Lindy Ave, Warwick, RI 02889
_____
Address

_____
E-mail address

_____
Telephone number

AO 440A (8/87) Notice and Acknowledgment For Service by Mail  @

# United States District Court

### DISTRICT OF

Jason Boudreau

V.

Steve Lussier, et al.

## NOTICE AND ACKNOWLEDGMENT
## FOR SERVICE BY MAIL

CASE NUMBER:

13-388 S

### NOTICE

To: **Steve Lussier, 95 Connecticut St, Cranston, RI 02920**

Name and Address of Person to be Served

   The enclosed summons and complaint are served pursuant to the Rule 4(c)(2)(C)(ii) of the Federal Rules of Civil Procedure.

   You must complete the acknowledgment part of this form and return one copy of the completed form to the sender to be received by the sender within 20 days of the date of mailing indicated below.

   You must sign and date the acknowledgment. If you are served on behalf of a corporation, unincorporated association (including a partnership), or other entity, you must indicate under your signature your relationship to that entity. If you are served on behalf of another person and you are authorized to receive process, you must indicate under your signature your authority.

   If you do not complete and return the form to the sender within the period indicated above, you (or the party on whose behalf you are being served) may be required to pay any expenses incurred in serving the summons and complaint in any other manner permitted by law.

   THIS FORM IS NOT AN ANSWER TO THE COMPLAINT. You must answer the complaint within the period of time indicated on the summons. If you fail to do so, judgment by default may be taken against you for the relief demanded in the complaint.

   I declare under penalty of perjury that this Notice and Acknowledgment of Receipt of Summons and Complaint will have been mailed on ____7/16/13____.

Date

_____
Signature of Sender

**Jason Boudreau, Pro-se**   90 Lindy Ave, Warwick RI 02889
Name of Sender                      Address of Sender

## ACKNOWLEDGMENT OF RECEIPT OF SUMMONS AND COMPLAINT

   I declare under penalty of perjury that I received a copy of the summons and of the complaint in this case on

_____ at _____

Date of Receipt                              Address

_____                        _____
Date of Signature                                Signature

_____                        _____
Name (Please Type or Print)          Relationship of Entity Served or Authority
                                                      to Receive Service of Process

_____
Current Address

AO 399 (01/09) Waiver of the Service of Summons

# UNITED STATES DISTRICT COURT
for the

| | |
|---|---|
| Jason Boudreau | ) |
| *Plaintiff* | ) |
| v. | ) |
| Steve Lussier, et al. | ) |
| *Defendant* | ) |

Civil Action No.

13-388 S

## WAIVER OF THE SERVICE OF SUMMONS

To:    Jason Boudreau, Pro-se
       *(Name of the plaintiff's attorney or unrepresented plaintiff)*

      I have received your request to waive service of a summons in this action along with a copy of the complaint, two copies of this waiver form, and a prepaid means of returning one signed copy of the form to you.

      I, or the entity I represent, agree to save the expense of serving a summons and complaint in this case.

      I understand that I, or the entity I represent, will keep all defenses or objections to the lawsuit, the court's jurisdiction, and the venue of the action, but that I waive any objections to the absence of a summons or of service.

      I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 within 60 days from   7/16/13  , the date when this request was sent (or 90 days if it was sent outside the United States). If I fail to do so, a default judgment will be entered against me or the entity I represent.

Date: _____

_____
*Printed name of party waiving service of summons*

_____
*Signature of the attorney or unrepresented party*

_____
*Printed name*

_____
*Address*

_____
*E-mail address*

_____
*Telephone number*

**Duty to Avoid Unnecessary Expenses of Serving a Summons**

      Rule 4 of the Federal Rules of Civil Procedure requires certain defendants to cooperate in saving unnecessary expenses of serving a summons and complaint. A defendant who is located in the United States and who fails to return a signed waiver of service requested by a plaintiff located in the United States will be required to pay the expenses of service, unless the defendant shows good cause for the failure.

      "Good cause" does *not* include a belief that the lawsuit is groundless, or that it has been brought in an improper venue, or that the court has no jurisdiction over this matter or over the defendant or the defendant's property.

      If the waiver is signed and returned, you can still make these and all other defenses and objections, but you cannot object to the absence of a summons or of service.

      If you waive service, then you must, within the time specified on the waiver form, serve an answer or a motion under Rule 12 on the plaintiff and file a copy with the court. By signing and returning the waiver form, you are allowed more time to respond than if a summons had been served.

Exhibit 5

EXHIBIT 3

## UNITED STATES COURT FOR THE
## DISTRICT OF RHODE ISLAND

JASON BOUDREAU           :
      Plaintiff         :
   VS.                :        C.A. NO. 13-0388-S-LDA
                        :

STEVE LUSSIER, JOHN LUSSIER,  :
DONALD LUSSIER, STEVE SOREL,  :
DET. KEVIN PETIT, OFFICER KIM  :
CARROLL, OFFICER NATHAN     :
BAGSHAW, OFFICER JAMES NEEDHAM:
SERGEANT WELLER, CITY OF     :
CRANSTON, CITY OF WARWICK    :
       Defendants

### AFFIDAVIT

I, Steven P. Lussier, after being duly sworn, upon oath depose and say as follows:

1. That I am the president of Automatic Temperature Controls, Inc. located at 95 Connecticut Street, Cranston, RI 02920 and I am also a shareholder of the company.

2. That in my capacity as the president and owner of the company, I have personal knowledge of the facts contained herein.

3. The Jason Boudreau was employed as the controller for the company from September 2009 until June 24, 2011.

4. In June 2011, the company's email service provider was Blue Host located in Provo, Utah.

5. In April 2013, the company decided to switch from an external email service provider to internal. To start this process, the server and components were purchased and installed by Star Computers out of Niantic, Connecticut. The invoice for the purchase of the goods is dated April 11, 2013 under invoice number 2130240 and is attached.

6. In May of 2013, the new server was operating and there was a transition period in connecting to and obtaining emails from Blue Host server and deleting them from the Blue Host server and moving and storing them on the new internal server at Automatic Temperature Controls, Inc.

7. This transition period ended on June 18, 2013 when all emails from this date forward were only being sent to the company's server and no longer to Blue Host.

Case 1:17-cv-00301-WES-PAS   Document 1-1   Filed 06/19/17   Page 81 of 100 PageID #: 84
Case 1:13-cv-00388-S-LDA   Document 190-3   Filed 08/29/14   Page 2 of 3 PageID #: 4940
Case 1:13-cv-00388-S-LDA   Document 94-2   Filed 04/11/14   Page 2 of 26 PageID #: 1595

8. During the transition period, active emails accounts were transferred to the company's new email server. Deleted emails from previously deleted accounts were not, as deleted email accounts and email contents are not stored by Bluehost after 30 days. No emails from the test123 account were transferred to our new email server.

9. The email account that was established at Blue Host under its webmail test123@autotempcontrols.com  when the software monitoring program was installed on or about June 14, 2011, to which the screen shots were sent were never downloaded or stored on the company's server.

10. The screen shots and results from the software monitoring program are contained on the hard drive of the Dell desktop computer that is being held by their Rhode Island State police as evidence.

11. The first notice I ever received that I was being named in a lawsuit being filed by Jason Boudreau was when I received in the mail the attached waiver of service of summons and complaint dated July 16, 2013.

12. I did not send back or respond to the waiver of the service of the summons and complaint.

13. Two months later, one of my employees Steve Sorel was served at our place of business with multiple summonses and a copy of the first amended complaint on or about September 27, 2013. This service pertained to the pending lawsuit filed against Steve Lussier, John Lussier, Donald Lussier and Steve Sorel.

14. There has been no destruction of evidence. The company's Dell desktop computer and hard drive which contains the evidence relevant to this case was turned over to the State police and is in their care and custody.

15. The earliest myself or any of the named employees from Automatic Temperature Controls, Inc. was ever aware of a lawsuit being filed against us by Jason Boudreau, with the exception of Donald Lussiser who was not named in the first complaint, was on or after July 16, 2011.

16. No evidence was destroyed or not preserved. The evidence that Automatic Temperature Controls, Inc. had was turned over to the State police.

_____
Steven Lussier

Subscribed and sworn to before me this 3rd day of April, 2014.

_____
Notary Public

ROBERT CHARLES GILLHEENEY
NOTARY PUBLIC
STATE OF RHODE ISLAND
NOTARY ID #755595
My Commission Expires July 28, 2017

Exhibit 6

7.   Q.     Okay. And what his job tasks with you?

     A.     **He was in charge of preparing financial statements, he was in charge of accounts payable and receivable of the people that actually did those two jobs. He handled - His responsibilities included the payroll and prevailing rate payroll for the employees in the field, and he was in charge of balancing and maintaining the - the - the many (phonetic) balances.**

8.   Q.     Did he have any authority to issue payroll checks?

     A.     **He did have authority to - to issue payroll checks, but he did not have authority to issue payroll bonus checks.**

9.   Q.     And how did the bonus checks work with - with the company, how were the bonuses applied to employees?

     A.     **The bonuses ... for employees, what would happen would be at the end of the year, our - our fiscal year ends in June, bonuses would then be given out to key employees based upon performance of - and they were paid out from the period of June -- Jul- you know, July 1st to September 15th, per the tax code. And that - that goes out to, you know, like I said, the - the key employees.**

10.  Q.     You had provided a - a document from your company describing the base salary and bonus compensation packages. Are these accurate at the time that this was drafted -

     A.     **Well --**

11.  Q.     -- while he was working there?

     A.     **Yes, that was - that was actually drafted, you know, for that financial - the position that he was in. We were looking to have somebody who could - who could maintain the books and control costs, and since he can, you know, since he controlled the - the finances, you know, cost was a - cost savings was what we were looking for at that time. So the bonus**

structure was set up so based upon the percentage of costs saved from year to year on a

similar - on a similar gross year, he would receive a bonus at the end of that fiscal year paid

out between June and - and - and September.

**12.   Q.**      So the - the bonuses weren't distributed other - outside the - the calendar year of July to

September?

**A.**      **Right. No, they weren't ... distributed.**

**13.   Q.**      So any distribution bonuses would not have been within company policy or authorized?

**A.**      **Correct.**

**14.   Q.**      Okay. Can you tell me what the performance was during the course of his employment

as far as entitlement to bonuses?

**A.**      **The uh - the -- Well, the first - the first year he was - he did the - he did the job, and**

**the cost numbers came down on the books, so he was paid out a bonus for that year. The**

**second year, because we had done all the cost-cutting, there was really no - not a lot of room**

**for a bonus based upon this structure. So - And we actually did not reach the end of that year**

**before he was -he was, you know, terminated from the company, and bonuses were paid out**

**to him by his own hand before that June 30th - the September 15th timeframe for - for**

**absolutely no reason at all.**

**15.   Q.**      Okay. So the years that you're referring to are the years of his employment, which was

September 2009 until when?

**A.**      **September of 2009 and he was gone 2011.**

**16.   Q.**      All right.

**A.**      **In June. So.**

**17.   Q.**      All right. So those are the records that you have as far as his performance and - and

eligibility regarding the bonuses.

    **A.**    **Yes.**

**18.**  **Q.**    Okay. Mr. Lussier, you also provided a - a spreadsheet, a payroll journal dated from

6/22/11 -- I'm sorry, correction, 1/20 in 2010 through 6/22/2011, listing the bonuses that were paid

out to employees, specifically, Jason Boudreau. Is this an accurate copy of the payroll journal from

your company?

    **A.**    **Yes, that's from the payroll company itself.**

**19.**  **Q.**    Okay. And you have on here a total amount that was discovered to be over paid to

Jason Boudreau of $39,147.00, is that correct?

    **A.**    **Yes.**

**20.**  **Q.**    Okay. Could you go through this - this journal and describe the - the bonuses that were

applied to him?

(PAUSE)

    **A.**    **It was May of 2010, a bonus of $5,000, which is not in that timeframe of year end to**

**fiscal year. The year-end would have ended the end of that month - by end of the - the**

**following month. And the bonus would - should have paid out after July 1st of that year,**

**between July 1st and September. Six twenty-eight - 6/28 is the last pay period of that 2010**

**year. This may have been the beginning of the bonus based upon this structure here. And**

**would have ended being paid out. ... see that other, you know, other employees, key**

**employees are getting bonuses at the same time. During that time from 7/12/2010, we paid**

**another 5,000, which that's - that was under that structure authorized 14 under the - under the**

**structure authorized, 75 - let's see - another five on 8/02, and it should end, another five on**

**8/09. Five on 8/16. Five thousand - Five thousand, I mean when I say "five," 5,000. Five**

Rhode Island State Police Headquarters                    Page: 5
WITNESS STATEMENT OF LUSSIER, STEVEN
Ref: 13RIX1-1630-OF

thousand on 8/23; 5,000 on 8/30; 5,000 on 9/03; 5,000 on 9/13. Now for a tax code, they should

end. And then the next - the next entry on the bonus is not until 11/29, which is out of that -

out of that timeframe. Paying bonus $500 to himself that's not authorized; $5,113.98, which

was not authorized.

21.   **Q.**    And what date was that?

      **A.**    That was on 12/06. On 12/13, a bonus of $1400, also not authorized. January 3rd of

2011, did a bonus of $8,022.79, which was not authorized. On 1/31, a bonus of $3,028.94 was

not authorized. Another one on January 14th of $3,380.84 was not authorized. We have $500

on February 28th of 2011, not authorized. Another five thousand eight - eighty-four dollars and

twenty-nine cents, also not authorized. Let's see. On March 3rd - on March 28th, 2011, another

$1,682.43 that was not authorized. Let's see, April 25th of 2011, $3500 was not authorized.

There was no - There was no bonus structure for any of this that happened, you know, during

that - that year, that fiscal year. We got May 9th, 2011, $3,747.88, not authorized. Another $500

on June twenty-  no, May 23rd, 2011. Okay, we have regular pay on 6/28, which - and then 6/28

I have a bonus of $5,000 that was also not authorized. And then the last pay period was

6/28/11, and that's when he was - he was terminated from the company.

22.   **Q.**    What was the total distribution to Mr. Boudreau of the course of that time that you just

described?

      **A.**    **Thirty-nine thousand, one hundred and forty-seven dollars.**

23.   **Q.**    Okay. In the - For the bonuses that were issued to Mr. Boudreau under the allotted

structure that you described between June - I'm sorry, July and September, those bonuses that were

issued to him would have normally been authorized. Why were they not - would they not have been

authorized?

     **A.**      In that - in that second fiscal year, because we had made the - well, we had made the adjustments, the cost-cutting measures that we needed to make, there were basically no more cost-cutting measures to make. So in his first year on the books, he basically showed a - a reduction of costs that warranted a, you know, a pretty hefty bonus at the end of that year.

**24.**  **Q.**     So he didn't qualify for the bonuses even though they were in the - the structure.

     **A.**      He wouldn't have qualified for the bonuses until the year was closed in - in June of two - of 2011.  So he was just basically taking bonuses, you know, without being - without a bonus structure.

**25.**  **Q.**     And how were the checks issued to him?

     **A.**      They were - It looks like they were issued as payroll checks and through the - through the payroll system.

**26.**  **Q.**     Okay. And who would authorize distribution or who would authorize the payment on those?

     **A.**      He - he had control of his pay - of the payroll.

**27.**  **Q.**     Okay.

     **A.**      So.

**28.**  **Q.**     And he had signing privileges - authority?

     **A.**      He didn't have signing privileges of - of the checks, but in our office we have a - a - a family friend that works -that's worked there by the name of Bob Gillheeney, and he has - he had the signing priv-  privileges on the checks.

**29.**  **Q.**     Could you spell Bob Gillheeney's name?

     **A.**      It's G-i-l-l-h-e-e-n-e-y. Robert Gillheeney.

**30.**  **Q.**     Okay. And how is he related to the family?

Rhode Island State Police Headquarters                    Page: 7
WITNESS STATEMENT OF LUSSIER, STEVEN
Ref: **13RIX1-1630-OF**

    A.    **He's been my father's friend for 50 years.**

31.  Q.    Okay. So as far as Mr. Gillheeney's involvement or culpability, how would - how would he be aware or would he be aware of the discrepancies in uh?

    A.    **He would - No, he wouldn't be aware of the discrepancies, J- uh, uh, Mis- Dave Boudreau was, you know, he was in our golf league with us, he was, you know, friendly with Bob and he was friendly with us, and - and until the end, you know, we - we really didn't know what kind of person we were - we were dealing with.**

32.  Q.    So Mr. Gillheeney authorized the checks based on good faith and trust?

    A.    **Yes.**

33.  Q.    Okay. Who was ultimately in charge of the --?

    A.    **... Dave Boudreau reported to me.**

34.  Q.    He reported to you.

    A.    **Yes.**

35.  Q.    Okay. And how did these discrepancies come to your attention?

    A.    **Well, what - what had had happened was, we - we noticed that there were some - some issues with the work that he was doing coming out of the - the computer ba- Well, we had issues with the computer. Actually, you might know more about it than I - than I do on that, but, where we had found that he wasn't - he was - he wasn't doing work while he was at work, he was v- visiting pornographic sites most of the day and most of the time that he worked there at night. And so what caused us to dig into that a little bit more was also that one of our checks bounced, and he claimed to have the - the checkbook balanced. So we started to really take a look at the work that he was doing, and then when we found all this, you know, it really came to a head with some - some of the illegal contraband that was found**

on the computer. And then also with - with all the entries that were entered into our system, all the checks that were out there that weren't accounted for, and the fact that our - our checking account was off by I believe it was somewhere in the range of $60,000, and that was his responsibility.

36.  **Q.**    Okay. So this was discovered inadvertently as the result of some illegal activity regarding child pornography in the computer, is that how that --

    **A.**    **Right.**

37.  **Q.**    -- was discovered?

    **A.**    **A- as we, as we saw what he was doing where basically he was - he was not doing his job, he wasn't doing anything. And then the Bank Rhode Island comes back with a - with a uh return check saying it - your check bounced, and - and all these things, so it kinda came to a head all at the same time. And it caused us to go back and look and say where are these bonuses coming from? Where is this, you know, where is this - all this, you know, money - money going and uh, and we found basically that he was - he was stealing.**

38.  **Q.**    Did he have his own office? Jason Boudreau, did he have his - his own private office?

    **A.**    **Yes, he did.**

39.  **Q.**    And the equipment that he used, the office equipment and the - the property that he was conducting business with was property of - of the company?

    **A.**    **Yes, the property of Automatic.**

40.  **Q.**    Okay.

    **A.**    **(Inaudible)**

41.  **Q.**    Now is there agreement with - with the employees of Automatic Temperature Control as far as the - the - the use of the company equipment such as the computer?

Exhibit 7

# WITNESS STATEMENT

**DATE:** April 16, 2014

**TIME:** 1:30 p.m.

**INTERVIEW OF:** Steven Lussier, President DOB: ░░░░░░░
Automated Temperature Controls
Cranston, Rhode Island
Cell #: ░░░░░░░░░

**INTERVIEW BY:** Detective James Brown
and
Investigator Gerard Ratigan
Rhode Island State Police Financial Crimes Unit

**LOCATION:** Rhode Island State Police Headquarters
311 Danielson Pike
North Scituate, Rhode Island 02857

**SUBJECT:** Jason Boudreau / Embezzlement

1.   **Q.**   Mr. Lussier, if you can just state your last name and spell it for us?

   **A.**   **Lussier, L-u-s-s-i-e-r.**

2.   **Q.**   And what's your birthday?

   **A.**   ░░░░░░░░░░░░░

3.   **Q.**   And a cell phone number or a good phone number to get in touch with you?

   **A.**   ░░░░░░░░░ **it's a cell phone.**

4.   **Q.**   And what do you do for work Mr. Lussier?

   **A.**   **I am the President of Automatic Temperature Controls. I do heating, air
conditioning, and temperature control engineering in - in the business we also - I run the
operations of - of Automatic Temperature Controls.**

5.   **Q.**   Is it safe to say that's a family business?

4

Rhode Island State Police Headquarters                    Page: 2
WITNESS STATEMENT OF LUSSIER, STEVEN #2
Ref: 13RIX1-1630-OF

| | | |
|---|---|---|
| | **A.** | **Yes.** |
| 6. | **Q.** | Who started that business? |
| | **A.** | **Donald Lussier.** |
| 7. | **Q.** | Who is? |
| | **A.** | **My father.** |
| 8. | **Q.** | And who - do the - any other family members work with you? |
| | **A.** | **My brother John.** |
| 9. | **Q.** | And you're here at the State Police about a possible embezzlement complaint against one of your former employees, is that correct? |
| | **A.** | **Yes.** |
| 10. | **Q.** | And who is that employee? |
| | **A.** | **Jason Boudreau.** |
| 11. | **Q.** | Do you know how to spell his last name? |
| | **A.** | **Yes. B-o-u-d-r-e-a-u.** |
| 12. | **Q.** | When - I know it's going back a while, but if to the best of your memory, when did you hire Mr. Boudreau to your business? |
| | **A.** | **I believe it was September of 2009.** |
| 13. | **Q.** | And what was his job title? |
| | **A.** | **He was the Controller.** |
| 14. | **Q.** | Meaning, what - what was his - kind of his, job function, what --? |
| | **A.** | **Um --** |
| 15. | **Q.** | What would he do as a Controller with your company? |
| | **A.** | **He maintained the -- all the bookkeeping, he kept the books, ... oversaw accounts** |

payable and accounts receivable. He also -- Yeah, he would do - he would call in the payroll,

the office payroll, and approve the - the field payroll to be - to be entered in for the week.

**16. Q.** Did you -- For payroll, did you use an outside payroll company?

**A.** **Yes, we used American Payroll at the time.**

**17. Q.** Who would fill out the - I imagine it's a electronic sheet that - Is that sent electronically to

the payroll company --

**A.** **Yeah.**

**18. Q.** -- to calculate the --?

**A.** **For the field payroll, it was Deb Donahue for the office payroll, and Jas- Jason**

**Boudreau.**

**19. Q.** He would be responsible solely for inputting hours, any overtime that would be accrued;

he would then send his records over to -- I'm sorry, you said the company, Automated --?

**A.** **American Payroll.**

**20. Q.** American. He would then send his findings to American Payroll Company, and then they

would cut the checks ..., yes?

**A.** **Yes.**

**21. Q.** And was it just his job? Anyone else for the company payroll, he was solely responsible

for that? Anybody else?

**A.** **Not - For the office payroll, he was - he was responsible for that, so that would be**

**anybody that worked in the office.**

**22. Q.** Now what was his benefit arrangement with your company, was he paid a salary? Was

he an hourly employee? How was he pa- How was he paid through your company?

**A.** **He was on salary, so he would be paid weekly. And then there was a savings**

bonus structure that he -- that was in place as well for - for basically trimming costs.

23.   Q.   Okay. When you say you - a "saving bonus," can you just kind of give us an overview of the - the savings structure that would have entitled him. Was - was - Before I get to that, just him or other employees entitled to this bonus as well?

A.   Not - not to that bonus, there were some private management bonuses out in the field that were tied to, you know, the - the project - the profit on a project: if they - if they were able to achieve a twenty-percent profit margin, anything above that they would get - they would get basically two percent of whatever it was [indiscernible / cross talk]...

24.   Q.   But that - that was why you had - there was --

A.   No. No.

25.   Q.   -- there was a - there was a bonus structure in place specifically for the Controller.

A.   Right.

26.   Q.   Right. Can you - If you can again, just kind of explain what - how - how that would have been calculated for Boudreau.

A.   Well, what it was, we had - we had a - Yeah, there - there's a - a formula that we came up with when we were hiring a controller, basically to cut costs. So the goal of the whole thing was to, you know, save on our - on our expenses. So if he cut our overall expenses by more than five percent year-to-date, you know, there was a - there was a bonus in there, and then it went up incrementally based upon how much he saved from - from one year-to-date year-end to the - to the next year-to-date year-end. So it was, yeah, when he first came in, we had year-to-date 2008 to 2009, and then, you know, when he came in, it was 2009 to 2010. So he would be actually working off of that bonus structure and not that year.

27.   Q.   So it's safe to say the more money he saved your company, the greater his bonus would

be?

**A.**      **Right. Correct.**

**28.**   **Q.**      Now how was -- Was he at some point during his employment, was he -- was there a

bonus structure calculated for him that he was in fact entitled to?

**A.**      **Yes.**

**29.**   **Q.**      And now what was that - Was the year-to-date, was it a calendar year or did you have a

company fiscal year?

**A.**      **It was a company fiscal year that ended in June.**

**30.**   **Q.**      So it went from July to June --

**A.**      **Yeah, July--**

**31.**   **Q.**      -- of last year.

**A.**      **Yup, July 1st to June 30th of the fo- of the following year.**

**32.**   **Q.**      Okay, how was he calculate- How was that fisc- So, you -- I'll let you explain it, how was

- how was he entitled to his bonus structure for that first year he was employed?

**A.**      **So, what - what we did was we basically, we looked at the expenses for 2008 /**

**2009, and then compared them to 2009 / 2010, and - and it was on a spreadsheet that him and I**

**reviewed. And -- and what we did was we adjust - we actually had to adjust for volume**

**because we're - we're a cyclical business, we're a contractor business, so we'll have different**

**... volume base - based upon, you know, how much work is out there for a year. So we**

**adjusted the expenses by the volume: basically, if you had - if we had done eight hundred**

**thousand dollars that year, and we did ten -- uh, yeah, ten -- a, a million the year before, it was**

**just like that ... you know, we've reduced by twenty percent. So to show that, okay, the - yeah,**

**here are the expenses minus twenty percent, and here are expenses for this year, so we can**

match it up, you know, get a - get a good eye here.

**INVESTIGATOR RATIGAN:**

33.  **Q.**     Mr. Lussier, without getting into as much detail, what you would do then is you would

match your fiscal year ended with the prior fiscal year, and if there was savings, he might be given a

bonus based on the amount of savings. Is that correct?

    **A.**     **Correct.**

34.  **Q.**     And for the first year he was there from calendar year of -- the fiscal year, excuse me,

ending June 10th, because he had savings compared to the fiscal year June - ending June of 2009,

he had a bonus, correct?

    **A.**     **Correct.**

35.  **Q.**     And that bonus was paid out during the period of June 10th through -- Excuse me, June

2010 through September 2010 of roughly thirty-six thousand dollars?

    **A.**     **Correct.**

36.  **Q.**     And the reason it was paid by September 2010, is because of IRS regulations, is that

correct?

    **A.**     **Correct. You have to bonus to your key employee. They allow you to bonus to your**

**key employees, but it has to be paid by September 15th.**

37.  **Q.**     And - and you had a meeting with him in which you and he and maybe your brother

reviewed the fiscal year results, and then he was paid, correct?

    **A.**     **Right. Yeah. Him and I reviewed the fiscal year results, and then he was - he was**

**paid.**

38.  **Q.**     And the next time you were due to review the results again would be a year later, is that

correct?

Rhode Island State Police Headquarters                   Page: 7
WITNESS STATEMENT OF LUSSIER, STEVEN #2
Ref: 13RIX1-1630-OF

A.      **A year later, correct.**

39.  Q.    And in the mean-- But you ne- Did you ever have that meeting in June of 2011?

A.      **No, we didn't.**

40.  Q.    Okay. And why didn't you have that meeting?

A.      **He was - he was arrested at our office. Actually, he was arrested for driving without a license, but we had also found --**

41.  Q.    Without - without going into the --

A.      **All right.**

42.  Q.    -- details of what might have committed, is it - is it fair to s-  As far as your business operations go, --

A.      **Yup.**

43.  Q.    -- did you get to the end of the fiscal year?

A.      **No.**

44.  Q.    And so - And when you did get to the end of the fiscal year, had it been - had there been more savings?

A.      **No, there were no savings.**

45.  Q.    So would he have been entitled to a bonus?

A.      **No.**

46.  Q.    Did he leave your employment at some point in time?

A.      **Yeah, dur--**

47.  Q.    In - in June of 2011?

A.      **Yeah, June of 2011.**

48.  Q.    After he left your employment, did you review some of your financial documents and

your pay registers?

    **A.**    **Yes.**

**49.**  **Q.**    And did you discover anything unusual about payments that he had received?

    **A.**    **Yes, we discovered that bonuses had been paid out: he had paid himself bonuses throughout the year, yeah to the - that were - that we noticed on the - the payroll journal.**

**DETECTIVE BROWN:**

**50.**  **Q.**    We have some documents here that I'm going to show you. But safe to say before we get into that, nobody in the company starting October 2010 through June 2011, for tax purposes, no one in your company would have been able to collect a bonus for any - any structure for the company, is that safe to say?

    **A.**    **The - Well, the only - the only bonuses that were collected were project managers - small bonuses like project management for individual projects.**

**51.**  **Q.**    But Mr. Boudreau would not have been.

    **A.**    **No.**

**52.**  **Q.**    The next meeting that he may have been entitled to would have taken place June 2011, where you would have calculated that fiscal year to the past fiscal year; any bonuses for that would have then started June 2011 to be paid for the last fiscal year. That's correct?

    **A.**    **Correct, same as the year before.**

**53.**  **Q.**    So you provided us some documents here; it looks like your payroll -- payroll journals as well as a - an ... individual earnings report for Mr. Boudreau. So you've highlighted some - some bonuses going through -- How many highlighted bonuses do you have here --

    **A.**    **Um --**

**54.**  **Q.**    -- if you can look at it really quick for me?

A.    About thirteen bonuses at a total thirty-four thousand one hundred and forty-seven dollars.

55.  Q.    And if I'm - if I'm reading this right, this is the first - first payment in question looks like it's dated December 1st of 2010, and the last one looks like it's dated June 8th, 2011. Am I reading that correct?

A.    Correct.

56.  Q.    So in - in that timeframe, he's paying himself bonuses totaling thirty-four thousand dollars.

A.    Correct.

57.  Q.    And he was not entitled to these bonuses.

A.    No.

**INVESTIGATOR RATIGAN:**

58.  Q.    And - and these are amounts over and above and separate from his regular salary that he was entitled to.

A.    Correct.

**DETECTIVE BROWN:**

59.  Q.    And in his payroll journal, to go to that, it looks like he's paid every week fourteen hundred dollars. Is that --

A.    C--

60.  Q.    -- that's his regular owed weekly salary?

A.    Yes.

61.  Q.    All right. So these are - these again, as - as Investigator Ratigan said, these are all above and beyond that fourteen hundred dollars.

     **A.**     **Correct.**

**62.**   **Q.**     Anything else you can think of that we haven't covered on in regards to his - his pay salary?  Was it ever -- One more thing. Was it ever -? That meeting in June 2011, that would have d-may have developed some sort of payment structure, that meeting never happened, he left for whatever reason, he left your employment at Automated Temperature Control prior to the June 2011 meeting where you would have compared the last two fiscal years.

     **A.**     **Correct.**

**63.**   **Q.**     Anything else you can think of?

     **A.**     **No, not -**

         **DETECTIVE BROWN: All right, that'll end the interview of Mr. Lussier. It is 1:48 p.m.**

**STATEMENT TAKEN BY:**

_____

**WITNESSED BY:**

_____